**LANDOHIO CORP. et al., Plaintiffs,**

v.

**NORTHWESTERN MUTUAL LIFE MORTGAGE AND REALTY INVESTORS, Defendant.**

No. C74-733.

United States District Court, N. D. Ohio, E. D.

Nov. 2, 1976.

Nickolas P. Andreeff, Amer, Cunningham & Brennan Co., L.P.A., Akron, Ohio, for plaintiffs.

William H. Wallace, Lee A. Chilcote, Jr., Thompson, Hine & Flory, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION

MANOS, District Judge.

On July 19, 1974 the plaintiffs, LandOhio Corp., Towpath Village Inc., David Brennan, and Thomas Merryweather, all residents of Ohio, filed this action seeking a declaratory judgment against the defendant, Northwestern Mutual Life Mortgage and Realty Investors, in the Summit County Ohio Court of Common Pleas. On August 16, 1974 the defendants removed the case to the Federal District Court for the Northern District of Ohio, asserting diversity of citizenship between the defendant and the plaintiffs, and that the amount in controversy exceeded $10,000. See, 28 U.S.C. § 1332. On September 4, 1974 the defendant filed an answer to the plaintiff's complaint, and a counterclaim for a declaratory judgment. On October 3, 1974 the Court overruled the plaintiffs' opposition to the removal petition, see, 28 U.S.C. § 1441, and on April 5, 1976 the Court partially granted Northwestern's motion for summary judgment.[1] On September 1, 1976, the Court tried the remaining issues, at the conclusion of which both parties moved for a directed verdict, which the Court overrules.

---

1. The plaintiffs' complaint also sought a declaratory judgment with respect to $31,615 which the plaintiffs paid as part of the loan commitment fee. The Court granted a summary judgment, declaring the defendant's entitlement to this fund on April 5, 1976.

On December 28, 1972 the plaintiffs and defendant entered into a written loan commitment for funds to improve 462 acres of the plaintiffs' land located between Akron Peninsula Road and Steels Corner Road in Ohio. See, Plaintiffs' Exhibit 1. The plaintiffs programmed the area for development into mixed residential and commercial properties known as Towpath Village. The defendant agreed to loan the plaintiffs $4,950,000, for four years and eleven months, at an interest rate of four percent above the prime rate quoted by the First National City Bank of New York on the first day of each month. Paragraph two of the loan commitment letter contained the condition covering prepayment of the loan:

"Prepayment in Full: The Borrower shall have the privilege, upon 7 days advance written notice, on any interest payment date, beginning January 1, 1975, of paying the loan in full with a prepayment privilege fee of 3.5%, said prepayment privilege fee to be calculated on the remaining balance of the loan."

On March 21, 1973 the parties agreed to a construction loan agreement and a mortgage agreement, and executed a promissory note for the loan amount. The loan was secured by a mortgage on the plaintiffs' 462 acres. The note retained the interest fee and prepayment penalty provision contained in the loan commitment letter, see, Plaintiffs' Exhibit 3, p. 1; and the release provisions originally stated in the commitment letter were restated in the mortgage agreement, see, Plaintiffs' Exhibit 4, p. 5, ¶ 11. In early April, 1974 the plaintiffs contracted to sell most of their land to the State of Ohio for park purposes.

The issue presented is whether the performance of the terms of a real estate loan is excused because the sale of the plaintiffs' land took place under the threat of condemnation proceedings.

Mr. William Nye, Director of the Ohio Department of Natural Resources during 1973 and 1974, testified that his department decided to acquire the plaintiffs' land for the Cuyahoga Valley Park, and in July and August of 1973 the Department received federal funds with which to buy the land needed. Nye alone selected the means by which the purchase was to be made and was the sole person to decide whether the Department would exercise its eminent domain power should it be necessary. Nye was particularly desirous of acquiring the Towpath Village property before it reached an advanced stage of single family residential development. He was concerned that such development would conflict with the "park vista," create a barrier to park use, and add problems to the Department's program to obtain land for the park by requiring it to negotiate with many single family residential owners rather than one large commercial property owner. In late November, 1973, following a written communication to the plaintiffs of the Department's interest in the land, Nye orally put one of the shareholders (Brennan) of LandOhio on notice of the Department's intention to buy the Towpath Village property. This personal notice was confirmed by letter on December 26, 1971. See, Defendant's Exhibit A.[2] In January, 1974, the Department appraised the plaintiffs' property and began immediate negotiations to secure it. In February, 1974 Nye met again with plaintiffs Brennan and Merryweather, and told them of the Department's intent to resort to eminent domain proceedings, if necessary, to acquire their land. Brennan said he did not want to sell the land, but he would sell under those conditions.

In March, 1974 the State of Ohio offered the plaintiffs $3,590,000 for 395 acres of their Towpath Village property. David Brennan immediately informed the defend-

2. Mr. Nye testified that his letter, Defendant's Exhibit A, does not mention condemnation because federal policy, which was involved in the Cuyahoga Valley Park Plan, discourages threats of condemnation before all avenues of appraisal and negotiation have been explored. Compare, 42 U.S.C. § 4651. In light of this federal policy, under which Nye operated, the Court finds Nye's testimony that his department orally admitted to the plaintiffs that condemnation was a serious possibility, not contradicted by the fact that Nye's December letter does not explicitly mention condemnation.

ant of this offer by letter dated March 29, 1974, and offered to prepay the loan principal upon receiving payment. Brennan also requested the defendant to release the property so the plaintiffs could complete the sale to the State. In that letter, Mr. Brennan wrote:

"Negotiations concerning this possible sale have been continuing for some months. Your office has been kept informed of the progress of these negotiations from time to time. The State has expressed its intention to file a condemnation action to take the land if we cannot enter into an Agreement." Plaintiffs' Exhibit 5, p. 2.

On April 4, 1974 Donald Hackbarth, the defendant's agent, in a letter to Brennan agreed to release the plaintiffs' land from the mortgage agreement, conditioned on the plaintiffs paying: the unpaid principal amount of the loan; accrued interest to the date of closing; interest on the unpaid principal at the rate of four percent *per annum* from the date of closing [May 30, 1974] until December 31, 1974; and a prepayment premium of three and one-half percent of the unpaid principal balance pursuant to the prepayment penalty provision contained in the note.[3] A dispute arose between the plaintiffs and the defendant regarding the conditions which the defendant imposed on its agreement to release the plaintiffs from the mortgage arrangement.

The sale of the plaintiffs' land to the State of Ohio was completed on May 30, 1974 pursuant to the terms of the State's offer, and a portion of the proceeds were escrowed pending resolution of the dispute between the plaintiffs and the defendant. *See,* Plaintiffs' Exhibit 8. The parties both admit that the plaintiffs paid the balance of the outstanding principal on the loan at the time of closing, as well as the accumulated interest due through May 31, 1974. The issues raised by the plaintiffs' complaint for a declaratory judgment, the defendant's counterclaim for a declaratory judgment, and the evidence at trial are:

(1) Whether the defendant is entitled to a prepayment privilege fee based upon 3.5% of the unpaid principal through May 1, 1974.

(2) Whether the defendant is entitled to additional interest due at the rate of 4% above the prevailing prime rate of the First National City Bank of New York on the unpaid principal balance of the loan for the period from May 31, 1974 to December 31, 1974.

I.

## PREPAYMENT PREMIUM

The defendant argues that it is entitled to a three and one-half percent prepayment charge based on the language of paragraph two of the loan commitment letter and the parallel provision contained in the subsequent mortgage agreement. The plaintiffs argue that they are relieved of the prepayment charge because their payment of the mortgage was triggered by an involuntary sale of the land to the State, under threat of condemnation proceedings. The defendant contends that the plaintiffs' sale of land to the State was not involuntary, but even assuming it was, the plaintiffs were still not relieved of their obligation to pay a prepayment fee. The defendant's argument lacks merit.

The Court finds that the plaintiffs' sale to the State was involuntarily induced under threat of condemnation proceedings. Both Brennan and Nye testified that the plaintiffs were advised that the Department of Natural Resources was prepared to appropriate the Towpath Village project if it could not purchase the land. Nye testified that his department had sufficient funds for such an appropriation, and that the land in question was vital to the Department's Cuyahoga Valley Park project. The State's several appraisals [4] of the Towpath Village property are crucial additional

---

3. *See also,* discussion in footnote 1, *supra.*

4. The record demonstrates that the Department conducted several appraisals of the plaintiffs' property in early 1974.

facts. When a state agency, possessing condemnation authority, objectively manifests its intention to obtain a property owner's land for public use by conducting a serious analysis of the value of the property, and subsequently orally informs the property owner of its intention to employ condemnation proceedings, if necessary, to obtain the property, the owner must logically conclude that the state means what it says. The conclusion that the sale was involuntary is further supported by the letter which Brennan wrote to Hackbarth in March, 1974. *See*, Plaintiffs' Exhibit 5, p. 2. Therefore, the Court concludes, from the evidence adduced at trial, that the plaintiffs' sale of the Towpath Village property was involuntary and was obtained under the coercive threat of State condemnation.

The defendant argues that the plaintiffs are not entitled to relief from the prepayment penalty provision despite a factual finding that the sale was involuntary, because no Ohio statutory or case law so indicates.

■ The Court finds that this diversity case is governed by Ohio substantive law and that no published Ohio authority deals with the question of whether a prepayment penalty, in a mortgage agreement, may be enforced against a mortgagor when the State coerces the mortgagor into selling the mortgaged land by threat of eminent domain proceedings. Therefore this Court is obligated, under the doctrine of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), to determine what Ohio courts would do if presented with this question. *See, Cooper v. American Airlines, Inc.,* 149 F.2d 355, 359 (2nd Cir. 1945) (Frank, J.); *Essex Universal Corp. v. Yates,* 305 F.2d 572, 580–82 (2nd Cir. 1962) (Friendly, J., concurring); *Pomerantz v. Clark,* 101 F.Supp. 341, 345–46 (D.Mass. 1951) (Wyzanski, J.).

■ The plaintiff says that if this case were litigated in an Ohio court, that court would adopt the approach of *Jala Corporation v. Berkeley Savings and Loan Association of Newark,* 104 N.J.Super. 394, 250 A.2d 150 (N.J.Super.1969). In *Jala* the plaintiff-mortgagor involuntarily lost his land to the state pursuant to eminent domain proceedings, and paid a prepayment penalty to the defendant-mortgagee pursuant to a prepayment clause similar to that expressed in LandOhio's note. *See, Jala, supra* at 152. Jala subsequently sued the mortgagor for the return of the prepayment penalty on the theory that the sale to the state was a forced, involuntary sale, and for that reason he was relieved of the duty to pay for early termination of his loan. The loan papers in *Jala,* like the loan papers in *LandOhio,* contained no express provision dealing with the effect of an involuntary, condemnation sale on the prepayment premium clause in the loan agreement. Based on these facts, which are almost identical with the facts of *LandOhio,* the *Jala* court held:

". . . . Thus, in the instant case we find that plaintiffs did not voluntarily exercise any 'right' or 'privilege' to prepay the unpaid balance of the mortgage, as was contemplated by the prepayment clause contained in the mortgage. Rather, the mortgagee was prepaid by reason of the fact that the State pursuant to its paramount right of eminent domain took the property for public use. As a result of this action by the State the mortgagor's . . . interest in the premises and the mortgagee's lien thereon were destroyed, and by operation of law both were transmuted to a present right to the funds deposited by the State with the clerk of the court. We cannot construe the language of the prepayment clause to make it applicable to the instant situation. Rather, we hold that the parties in inserting this clause did not contemplate a taking of the premises by eminent domain. . . . 'If defendant (the obligee-mortgagee) believed it should be entitled to the premium under these circumstances it could easily and should have so provided in the bond and/or mortgage. In the absence of such a provision we believe that defendant who received the entire unpaid principal and accrued interest of its mortgage is not entitled to the

prepayment premium.'" *Jala, supra* at 154.

Several cases follow the *Jala* rule that when the state coerces the sale of a mortgagor's property through the exercise of its condemnation power, the mortgagor is relieved of the contractual duty to render a prepayment premium to the mortgagee, unless the parties have *explicitly* agreed that such a payment shall be made even in the event that the mortgagor is forced to sell his property. *See, Shavers v. Duval County,* 73 So.2d 684, 689–92 (Fla.1954); *Associated Schools v. Dade County,* 209 So.2d 489, 490 (Fla.App.1968); *Compare, Chestnut Corporation v. Bankers Bond and Mortgage Company,* 395 Pa. 153, 149 A.2d 48, 49–50 (1959). This Court, recognizing its duty to "do its best" to determine what the law of Ohio is with respect to this question, *see,* Corbin, *The Laws of the Several States,* 50 Yale L.J. 762, 775–76 (1941), holds that Ohio courts would adopt the *Jala* rule and therefore declares that a prepayment premium may not be assessed against the plaintiffs in an involuntary sale of their mortgage property.[5]

**5.** The plaintiffs also argued that the language of the prepayment premium provision precludes assessing a prepayment penalty unless the prepayment occurs after January 1, 1975 because the language creates the right to prepay only after January 1, 1975. The plaintiffs' reading of the loan documents would preclude prepayment before that date, and a *fortiori* excludes the possibility of a prepayment premium for total satisfaction of the loan prior to January 1, 1975. The Court finds that the more sensible reading of the language contained in the loan documents is that (1) the plaintiffs possessed an absolute right to prepay the loan after January 1, 1975, and (2) that it was the intention of the parties that whenever the plaintiffs prepaid the loan, whether before January 1, 1975 by agreement with the defendant or after that date according to their absolute contractual right, they were required to pay an early payment premium. Therefore the Court's decision denying the defendant entitlement to a prepayment penalty rests solely on the involuntary, coercive nature of the plaintiffs' sale to the State coupled with the absence of an explicit contractual provision dealing with the consequences of the State's exercise of its eminent domain power.

## II.

### ADDITIONAL INTEREST FOR THE PERIOD MAY 31, 1974 THROUGH DECEMBER 31, 1974

■ The defendant asserts a right to interest payments for the period of May 31, 1974 through December 31, 1974, because the loan documents entitle it to "bonus interest" if individual parcels of Towpath Village land were sold at certain specified prices,[6] and because the bulk sale of the land to the State denied it the opportunity to earn a bonus from incremental sales of small parcels. The defendant's contention lacks merit.

The record clearly demonstrates that the full principal and accumulated interest on the loan was paid on May 31, 1974, and that the loan documents expressed no duty requiring the plaintiffs to pay an interest amount after the return of the principal. The defendant nevertheless argues it is entitled to an additional payment as a compromise for the lost opportunity to earn a bonus on individual land sales and that the interest figure is merely a method of calculating the amount of the compromise. However, the defendant did not show that it is entitled to bonus interest for the sale

The defendant endeavored to weave an argument based on the policy underlying *federal* land appropriations, *see,* 42 U.S.C. §§ 4653, 4655. The Court finds *federal* land appropriation policies and statutes irrelevant to the substantive question posed by this *diversity* case; namely, what is the applicable Ohio law regarding land appropriations and prepayment penalties.

**6.** The note, executed March 21, 1973, Plaintiffs' Exhibit 3, sets forth the conditions which must be satisfied before the defendant could obtain a right to "bonus interest." The conditions indicate that specific categories of property in the development must be sold at or above certain pegged prices before the defendant became entitled to bonus interest. However, the record does not indicate that any of the pegged prices were attained. Certainly the testimony that the State paid approximately $9,000 per acre for the undeveloped land does not support the defendant's position because that figure is considerably lower than, or not translatable into, the pegged prices and price formulas expressed in the bonus interest provision of the note.

of the land at the price which the State paid, nor that the defendant's method of calculating a "compromise," substitute for bonus interest bears a relation to the terms expressed in the loan documents. *See,* Defendant's argument for a directed verdict at the close of the case. Consequently the Court declares that the defendant is not entitled to additional interest calculated over the period of May 31, 1974 through December 31, 1974.

### III.

### CONCLUSION

The Court finds that the defendant is *not* entitled to a prepayment premium for early payment of the loan, and that the defendant is *not* entitled to additional interest calculated from May 31, 1974 through December 31, 1974. The Court directs the Clerk to prepare a final declaratory judgment order in this case in accordance with its findings and the escrow agreement between the parties (Plaintiffs' Exhibit 8). *See,* 28 U.S.C. § 2201.

This Memorandum of Opinion is adopted as Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.