CUDAHY, Circuit Judge.
 

 This appeal primarily involves a contest over a mortgage holder’s right to receive a stipulated premium in exchange for accepting a borrower’s repayment of a loan before
 
 *329
 
 maturity. The dispute is complicated somewhat by the fact that at the time of the prepayment the borrower was in a Chapter 11 bankruptcy proceeding. The bankruptcy court held that the mortgage holder was entitled to the prepayment premium, but the district court reversed. Because we believe that in the particular circumstances of this case the holder’s right to a prepayment premium was not triggered, we affirm.
 

 This case also involves a question about the holder’s right to certain late payment charges. On this issue we reverse the district court’s denial of the charges and remand.
 

 I.
 

 Appellant National Life Insurance Company (“National”) was the assignee of a promissory note and mortgage in the principal amount of $775,000. The note was secured by the mortgage on an office building and parking garage in Indianapolis known as the “1800 Building.” Appellee LHD Realty Corporation (“LHD”) is a real estate management and investment company which acquired the 1800 Building in 1972 and assumed the note and the mortgage on the building which secured the note. Repayment of the promissory note was to be made in monthly installments over a period of fifteen years. The note provided that, if the loan was paid before maturity, the holder was entitled to a prepayment premium.
 
 [1]
 

 On June 13, 1980, LHD filed a voluntary petition under Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101
 
 et seq.
 
 (the “Bankruptcy Code”), and since then has been operating its business and managing its property as a debtor in possession. Between July 1980 and April 1981, LHD made its monthly mortgage payments to National, although the payments were late each month. Since the April 1981 payment, however, LHD has not made any mortgage payments to National.
 

 On August 26, 1981, with four monthly payments overdue, National filed in the bankruptcy court a request for relief from the automatic stay of proceedings against LHD provided by 11 U.S.C. § 362. National stated in its complaint for relief that
 

 [i]t is obvious there is no reasonable likelihood of rehabilitating the ailing Debt- or.... A continued delay in allowing [National] to foreclose its lien will cause obvious irreparable harm to [National] because of the lack of adequate protection.
 

 National therefore asked the bankruptcy court to allow it “to proceed with foreclosure of its lien” or to dismiss the bankruptcy action or to convert the Chapter 11 proceeding to a Chapter 7 liquidation, whereupon the 1800 Building would be sold at public auction.
 

 On September 10, 1981, shortly after National filed its complaint for relief from the stay, LHD filed an application with the bankruptcy court seeking authority to employ a realtor to list the 1800 Building for sale. The application was approved and LHD found a buyer. On December 8, 1981, LHD filed with the bankruptcy court a complaint to sell the 1800 Building.
 

 On December 15, 1981, there was a preliminary hearing on National’s request for relief from the stay. National argued that the building income was not sufficient to support the existing debt and that the owner’s equity in the building, which protected the secured lender, was decreasing. National then stated,
 

 Therefore, your Honor,
 
 we think that this stay should be released and Plaintiffs
 
 
 *330
 

 have an opportunity to proceed with foreclosure,
 
 which we would suggest is still going to take seven or eight months, . . . and until such time as we would then have a sheriff’s sale, which would at minimum have to go to eight or nine months from now,
 
 the estate would have the opportunity to redeem it by basically paying the Plaintiff off.
 

 Transcript of Proceedings of December 15, 1981 at 42-43 (emphasis supplied). In its trial brief National stated that, if it was relieved from the stay, it would “proceed to file a state action to foreclose its mortgage.” In closing argument National summarized its position: “so we would again ask that this either be converted to a Chapter 7 and dismissed, or the stay be released as we don’t have adequate protection.”
 
 Id.
 
 at 66.
 

 On December 18, 1981, the bankruptcy court issued its decision denying preliminarily the relief sought by National. The court based its decision not to lift the stay or dismiss or convert the proceeding on a finding that:
 

 There is reasonable cause to believe that: the offer made by the prospective purchaser is valid; the purchaser is making a good faith effort to obtain financing; and, the proposed purchase price of $975,-000.00 represents the fair market value of the property.
 

 As discussed earlier, the total amount owing to creditors on the 1800 Building is approximately $634,000.00.. .. [S]uch surplus or equity in the property [$341,-000] clearly shows that [National] is adequately protected.
 

 Entry on Complaint for Relief from Stay at 3. The bankruptcy court then scheduled a final- hearing on the relief request to be held thirty days later, on January 18, 1982.
 

 On December 23, 1981, National filed its response to LHD’s motion for permission to sell the 1800 Building. National asked for payment in full or a lien on the proceeds until paid, with the proceeds being held in a restricted account controlled by the court.
 

 On January 15, 1982, the bankruptcy court issued its decision permitting LHD to sell the 1800 Building. The court’s order provided that proceeds from the sale were to be retained and segregated by the debtor until the allowed liens and claims were paid.
 

 On January 18, 1982, the bankruptcy court held the final hearing on National’s request to be relieved from the stay. National argued again that it was not adequately protected and that it “need[ed] to basically proceed to realize our collateral.” Transcript of Proceedings of January 18, 1982 at 73. The bankruptcy court, however, did not issue a final decision on National’s request and it has since become moot.
 

 II.
 

 The parties agree that prepayment premiums serve a valid purpose in compensating at least in part for the anticipated interest a lender will not receive if a loan is paid off prematurely. Among other things, a prepayment premium insures the lender against loss of his bargain if interest rates decline. Accordingly,' reasonable prepayment premiums are enforceable.
 
 See generally
 
 Annot., 86 A.L.R.3d 599 (1978); Annot, 75 A.L.R.2d 1265 (1961).
 
 [2]
 

 There are, however, some limitations upon the right to receive a prepayment premium. For one, the lender
 
 [3]
 
 loses its right to a premium when it elects to accelerate the debt.
 
 Slevin Container Corp. v. Provident Federal Savings & Loan Ass’n,
 
 98 Ill.App.3d 646, 54 Ill.Dec. 189, 424 N.E.2d 939 (1981). This is so because acceleration, by definition, advances the maturity date of the debt so that payment thereafter is not prepayment but instead is payment made
 
 *331
 
 after maturity.
 
 [4]
 
 For another, courts infer an exception when a mortgage upon the property being condemned is satisfied by a government exercising its power of eminent domain.
 
 Jala Corp. v. Berkeley Savings & Loan,
 
 104 N.J.Super. 394, 250 A.2d 150 (1969). Finally, courts infer an exception when payment results from destruction of the mortgaged property through an insured-against casualty such as a fire.
 
 Chestnut Corp. v. Bankers Bond & Mortgage Co.,
 
 395 Pa. 153, 149 A.2d 48 (1959).
 
 [5]
 

 We think that the case before us falls within the acceleration exception. The contract between National and LHD authorized National, “without notice, [to] declare the remainder of the debt at once due and payable.” When a lender has the option to accelerate, “ ‘[i]t is only necessary that the mortgagee show an
 
 unmistakeable intention to exercise the option,
 
 and this may be done by taking steps for foreclosure, filing foreclosure suit, sale pursuant to the mortgage, or advertisement of the property for sale pursuant to the terms of the mortgage.’ ” Rosenthal,
 
 The Role of Courts of Equity in Preventing Acceleration Predicated Upon a Mortgagor’s Inadvertent Default,
 
 22 Syracuse L.Rev. 897, 899 n. 8 (1971) (quoting from 2 L. Jones, Mortgages § 1512 (8th ed. 1928)) (emphasis supplied).
 
 446 West 44th St., Inc. v. Riverland Holding Corp.,
 
 267 App.Div. 135, 44 N.Y.S.2d 766, 768 (1943) (election to accelerate “must consist either of notice of election to the mortgagor or of some unequivocal overt act manifesting an election....”) (citation omitted).
 

 The point is, we think, that a lender may abandon or waive its claim to interest payable over a period of years and to what amounts to insurance against a decline in interest rates. Thus, the lender, by its acts, may establish that it prefers accelerated payment to the opportunity to earn interest over a period of years. It is not appropriate, under these circumstances, for the lender to receive a prepayment premium in lieu of the interest foregone since it has voluntarily waived the unpaid interest in the expectation of accelerated payment of the remaining principal.
 

 Thus, we think National exercised its option to accelerate no later than August 26, 1981, when it filed. its request for relief from the automatic stay. National told the bankruptcy court that “it is obvious there is no reasonable likelihood of rehabilitating the ailing Debtor [LHD]” and asked the bankruptcy court to allow it to “proceed with foreclosure” or to dismiss or convert the Chapter 11 proceeding. National’s actions established that it preferred, sensibly no doubt, accelerated payment over the “opportunity” to earn interest from the LHD loan over a period of years.
 

 National argues, however, that a
 
 per se
 
 rule that acceleration precludes a claim for a prepayment provision will cause borrowers to default intentionally and to court acceleration and foreclosure in order to avoid prepayment liability. But this scenario seems implausible given the ramifications of default for a borrower’s credit rating and the ability of the lender to sidestep the ploy by suing only for overdue payments as they mature, together with attorney’s fees. Also, the borrower would run the risk of not being able to repay the loan in time to defeat the foreclosure sale. Should such intentional defaults become a problem, however, we believe courts could deal with the difficulty by denying the acceleration exception in appropriate cases. In any event, National does not suggest that LHD implemented such a strategy in the case before us.
 

 National also argues that it cannot be deemed to have accelerated the loan
 
 *332
 
 because it was precluded from accelerating by the Bankruptcy Code’s automatic stay provision, 11 U.S.C. § 362. At least one bankruptcy court has agreed, in dicta, with National’s argument.
 
 See In re Davidson Lumber Co.,
 
 24 B.R. 49, 51 (Bkrtcy.S.D.Fla. 1982). But we think that, although section 362 stays foreclosure, it need not be read to preclude acceleration. Instead, at least in a Chapter 11 proceeding, acceleration appears to be a conditional right of the lender subject to being undone by the cure provisions of sections 1123(a)(5)(G) and 1124. Section 1124(2) of the Bankruptcy Code expressly recognizes that a debtor pursuant to a Chapter 11 plan may reverse the acceleration of an obligation caused by his default:
 

 (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default — [the acceleration can be undone if the plan:]
 

 (A)
 
 cures any such default,
 
 other than a default of a kind specified in section 365(b)(2) of this title,
 
 that occurred before or after the commencement
 
 of the case under this title;
 

 (B)
 
 reinstates the maturity
 
 of such claim or interest as such maturity existed before such default;
 

 (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and
 

 (D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest;
 

 11 U.S.C. § 1124(2) (emphasis supplied).
 
 See In re Hewitt,
 
 16 B.R. 973 (Bkrtcy.D. Alaska 1982).
 
 See generally
 
 5 CollieR On Bankruptcy ¶ 1124.03[2] (L. King 15th ed. 1983) (“Deacceleration”). The Senate Report on section 1124 explains the rationale for the power to “deaccelerate”:
 

 a claim or interest is unimpaired by curing the effect of a default and reinstating the original terms of an obligation when maturity was brought on or accelerated by the default. The intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain. Curing of the default and the assumption of the debt in accordance with its terms is an important reorganization technique for dealing with a particular class of claims, especially secured claims.
 

 S.Rep. No. 989, 95th Cong., 2d Sess. 120,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad. News 5787, 5906.
 

 Since section 1124 recognizes the authority to “deaccelerate” a mortgage, and since section 1124(2)(A) refers in this context to defaults (and presumably accelerations) occurring
 
 after
 
 commencement of the case under Chapter 11, the implication is that a lender can accelerate a loan notwithstanding section 362, subject to its action being reversed pursuant to section 1124. Thus, National could, and did, accelerate its loan and thereby waived its right to a prepayment premium. It made its choice and section 362 does not appear to nullify the election. Thus, if the lender wishes to preserve its right to a premium, it must forbear from exercising its acceleration option and await the trustee’s or the debtor’s decision. Should the trustee or the debtor then decide to repay the loan, the lender would presumably be able to enforce an otherwise valid prepayment premium.
 
 [6]
 
 But we need not decide this point here.
 

 National also argues that the case should be controlled by the bankruptcy court’s finding that
 

 
 *333
 
 LHD was not forced or coerced into selling the 1800 Building by any actions taken by National. Rather, LHD’s act was voluntary since it had to sell given the unfortunate and disadvantageous economic situation it found itself to be in. LHD was motivated by a desire to do what was in fact in the best interests of itself and its creditors, not by the mere filing of a Complaint for Relief from Stay.
 

 But we do not believe that the fact LHD may have-cooperated, or acted in concert with National’s acceleration, changes the effect of National’s election to trade payment now for interest payments later. A contrary rule would seem to enmesh courts in unnecessary hunts for the “true” cause of a loan repayment. National fired the first shot and is bound thereby.
 
 [7]
 

 Finally, National argues that the district court cannot be affirmed on the basis of National’s acceleration of the loan because acceleration is a factual issue, the bankruptcy court did not make a finding on the acceleration issue and the failure of the bankruptcy court to find acceleration constitutes a finding against LHD. But the facts relevant to National’s acceleration are not in dispute and “acceleration” is at least in part a legal conclusion. Therefore we are not bound by the bankruptcy court’s failure to address the acceleration issue.
 

 III.
 

 National also appeals from the district court’s denial of late charges claimed by National, which had been allowed by the bankruptcy court. National accepted late payments for the period from July 1980 to April 1981. The promissory note provided that National could collect a late charge for late installments “for the purpose of covering the extra expense involved in handling delinquent installments.” The Bankruptcy Code, 11 U.S.C. § 506(b), also allows for the recovery of such charges by the holder of an allowed secured claim secured by property whose value is greater than the amount of the claim and we see no basis to deny them to National.
 
 [8]
 
 Moreover, LHD did not appeal the bankruptcy court’s late payment charge allowance. Therefore, the district court, sitting as an appellate court vis-a-vis the bankruptcy court, should not, absent circumstances we do not perceive, have reversed the finding regarding the allowance. Hence, we remand for reinstatement of the late payment charges.
 

 Affirmed In Part, Reversed In Part, And Remanded.
 

 [1]
 

 . The clause controlling prepayment states:
 

 No prepayment of principal may be made during the first ten (10) loan years. After tenth (10th) loan year, the right is reserved upon sixty (60) days’ prior notice in writing, to prepay on any interest payment date all or any portion of the note principal by paying a premium on the amount prepaid as follows: During the eleventh (11th) loan year at five (5%) per cent, declining one (1%) per cent per year thereafter to a minimum of par. In the event of prepayment in full only, and in addition to the foregoing, an additional prepayment premium will be payable in an amount computed as follows: The average “additional interest” payments for the three (3) preceding years capitalized at thirty-three and one-third (33'/3%) per cent.
 

 [2]
 

 . Neither party has cited, and we have not discovered, any reported Indiana cases regarding prepayment premiums.
 

 [3]
 

 . For ease of understanding we refer to National as the “lender,” although actually National was assigned the promissory note and mortgage. Similarly, there was a predecessor' in interest to LHD that executed the note, but we refer to LHD as the “borrower.”
 

 [4]
 

 . Even after acceleration, a lender may be able to regain its right to a premium by revoking its acceleration and reinstating the mortgage prior to detrimental reliance by the borrower on the acceleration.
 
 Berenato v. Bell Savings & Loan Ass’n,
 
 276 Pa.Super. 599, 419 A.2d 620, 622 (1980).
 

 [5]
 

 . These exceptions have been read into contracts by courts and could presumably be modified by the parties through appropriate contractual provisions.
 

 [6]
 

 . Given our disposition of the case we need not address LHD’s argument that the “premium” is an unenforceable penalty for breach.
 

 [7]
 

 . As earlier indicated, National might have revoked its acceleration (before the borrower’s reliance on the acceleration), or a Chapter 11 plan might have undone or reversed the acceleration.
 

 [8]
 

 . Indiana law allows for the recovery of reasonable late charges pursuant to an agreement.
 
 Bowery Savings Bank v. Layman,
 
 142 Ind.App. 170, 233 N.E.2d 492 (1968).