*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0096P (6th Cir.)
File Name: 01a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

  *v.*

WILLIAM HARRIS,
  *Defendant,*

NATIONAL REALTY FINANCE,
L.C. (99-4175/4492), and
LASALLE NATIONAL BANK
(99-4269),
  *Claimants-Appellants.*

Nos. 99-4175/
4269/4492

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 98-00819—David A. Katz, District Judge.

Argued: January 26, 2001

Decided and Filed: April 4, 2001

Before: JONES, BATCHELDER, and CLAY, Circuit
Judges.

1

———————————

**COUNSEL**

**ARGUED:** Daniel J. Flanigan, POLSINELLI, WHITE & VARDEMAN, Kansas City, Kansas, Marvin A. Robon, BARKAN & ROBON, Toledo, Ohio, for Appellants. Seth Uram, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** Brett D. Anders, POLSINELLI, WHITE & VARDEMAN, Kansas City, Kansas, Michael S. Jones, LYDY & MOAN, Sylvania, Ohio, Marvin A. Robon, Gregory R. Elder, BARKAN & ROBON, Toledo, Ohio, for Appellants. Seth Uram, Lawrence J. Kiroff, ASSISTANT UNITED STATES ATTORNEYS, Toledo, Ohio, Stephen R. Heifetz, DEPARTMENT OF JUSTICE, CRIMINAL DIVISION, Washington, D.C., for Appellee.

———————————

**OPINION**

———————————

CLAY, Circuit Judge.   This is a consolidated appeal involving the determination of rights of innocent third-party lenders, National Realty Finance, L.C. ("NRF") and LaSalle National Bank ("LNB"), (collectively "Claimants"), in real estate formerly owned by Defendant, William Harris, and forfeited to Plaintiff, the United States of America. Claimants all appeal from the same judgment; specifically, in Case Nos. 99-4175 and 99-4492 involving Claimant NRF, and in Case No. 99-4269 involving Claimant LNB, Claimants appeal from the judgment entered by the district court on September 13, 1999, awarding Claimants "principal and interest on their loans to William Harris at the default rate, and to reasonable costs, late charges and attorney fees," while denying Claimants "prepayment premiums, or . . . late charges beyond those reasonably necessary to reimburse the lenders for transaction costs associated with processing late payments." The narrow issue on appeal, which presents itself for the first time in a federal appellate court, is whether an innocent lender

against the intent of Congress in enacting § 853(n)(6)(B). *See id.*

Having found that the district court erred in holding that Claimants were not entitled to prepayment premiums, we need not address the additional arguments raised by the parties, what the government terms "secondary arguments," including whether the government was bound under principles of *res judicata* from litigating the issue of prepayment premiums as to the properties for which LNB received cognovit judgments in state court.

## CONCLUSION

For the above-stated reasons, we **REVERSE** the district court's judgment denying Claimants prepayment premiums as provided under the loan agreements, and **REMAND** case to the district court for proceedings consistent with this opinion.

is entitled to prepayment premiums as provided in the loan agreement upon the real property being forfeited to the government, and later sold by the government, as a result of a criminal forfeiture proceeding against the debtor. We answer this issue in the affirmative under the facts of this case.

Accordingly, we **REVERSE** the district court's judgment and **REMAND** the case to the district court.

### BACKGROUND
### Procedural History

This case involves a criminal forfeiture in which Defendant was indicted on various charges of Medicare fraud and money laundering on September 23, 1998. On January 20, 1999, the government accepted Defendant's guilty plea wherein Defendant withdrew his previous plea of not guilty, and entered a written plea agreement to charges 1 and 101 of the indictment. On this date, the government also moved for a preliminary order of forfeiture, which was granted; while Defendant waived notice of forfeiture as well as the right to appeal the order of forfeiture. The property seized by the government included real estate owned by Harris Management Service, Inc. ("HMSI"), an Ohio Corporation wholly owned by Defendant and his wife. Claimants in this matter are innocent third party lenders who held mortgages on this real estate, and each therefore petitioned the district court for a hearing to adjudicate the validity of the legal interests asserted in the property pursuant to 21 U.S.C. § 853(n)(2) ("Petition for Hearing and for Validation of Mortgage of Lien Interests"). Specifically, NRF filed a petition asserting that it held valid, first priority liens on property known as the Fox Run Apartments and the RiverBend Apartments; LNB likewise filed a petition as to four large apartment complexes in the Toledo, Ohio area known as the Hunt Club, Windjammer, Devonshire, and Wellington House Apartment Complexes.

On June 7, 1999, the district court held a hearing to consider the extent of Claimants' asserted interests in the property. Following the hearing and submission of briefs by the parties, the court issued a Memorandum Opinion and Order finding that Claimants were entitled to "principal and interest at the default rate, and to reasonable costs, late charges and attorney fees," but that they were not entitled to "prepayment premiums, or to late charges beyond those reasonably necessary to reimburse the lenders for transaction costs associated with processing late payments." The district court entered a corresponding judgment and it is from this judgment that Claimants now appeal.

### Facts

Defendant amassed a real estate empire consisting of several residential rental properties in Toledo, Ohio, which, according to the government, Defendant financed by defrauding the federal Medicare program. Between July of 1993, when Medicare first paid Defendant for what later were found to be fraudulent claims, and September of 1995, when the government took action against Defendant, the government claims that Defendant used over $8,000,000 of the monies which he received as a result of his fraudulent dealings with Medicare as down payments for dozens of properties worth at lest $25,000,000.

Specifically, on September 19, 1995, federal agents executed search warrants at the offices of Harris Medical Supply ("HMS"), a company that Defendant used to defraud Medicare, and at HMSI, a company that Defendant used to manage his rental properties. Within three months after the searches were executed, Defendant established a nominee corporation called Ashton Button Company, Ltd. in the Cayman Islands, and a second nominee corporation called Iguana Reef, Ltd., also in the Cayman Islands. Over the eighteen months between March of 1996, and September of 1997, Defendant wire-transferred at least $2,700,000 to the Cayman Islands and used these funds to buy real estate in the

translates easily into the forfeiture context, describing a scenario similar to that of the instant case:

> After the commission of the criminal acts, title to the forfeitable property, by operation of the relation-back clause, actually belongs to the government. The property itself, however, generally remains in the criminal defendant's physical possession until the government discovers the criminal acts and takes possession of the forfeitable property. While the forfeitable property is in the defendant's possession, the defendant possesses only voidable title, but ordinarily, a prospective purchaser of the forfeitable property will have no notice that the defendant lacks a valid, transferable interest. Section 853(n)(6)(B) ensures that, if indeed the defendant transfers the forfeitable property for value to a purchaser who, at the time of the purchase, is without knowledge of the government's interest in the property, the government may not later assert title superior to that of the innocent purchaser.

*Id.* at 286.

In other words, as found by the Third Circuit, the *bona fide* purchaser exception of § 853(n)(6)(B) includes those individuals who purchase for value forfeitable property as innocent buyers or lienholders and that, by virtue of the relation-back doctrine, once the property is forfeited, the government steps into the shoes of the defendant acquiring only the rights of the defendant at the time of the criminal acts, and nothing more. *See Lavin*, 942 F. 2d at 185-86. Accordingly, it logically follows that in the case at hand, the government assumed no greater rights than that of Defendant, and because Defendant would have been bound to pay prepayment premiums to Claimants on the outstanding defaulted loan obligations, the government must also be bound to do so. To hold otherwise would give the government greater rights than Defendant, and would go

The Third Circuit found it "helpful to ascertain the source of Congress' language" in order to better understand what individuals Congress intended to protect through the enactment of these two subsections. Specifically, the court reasoned as follows:

> As far as we can tell, Congress derived both exceptions essentially from hornbook commercial law. The first exception, codified in section 853(n)(6)(A), reflects the common-law principle, embodied in the venerable maxim *nemo dat qui non habet*, that a buyer acquires no better title than that of the seller. *See* UCC § 2-403(1) ("A purchaser of goods acquires all title which his transferor had at had power to transfer . . . ."). Under the relation-back doctrine, the government acquires its interest in the defendant's forfeited property at the time of the commission of the criminal acts giving rise to the forfeiture. *See* 21 U.S.C. § 853(c). Thus, if a third party's interest in the forfeited property, at the time of the criminal acts, was superior to the criminal defendant's interest, then the interest that the government acquires when it steps into the defendant's shoes is subordinate to that of the third party. . . .
>
> The second exception, codified in section 853(n)(6)(B), reflects another common-law rule (an exception to the *nemo dat qui non habet* principle), namely, that an "innocent purchaser for valuable consideration must be protected." The good-faith purchaser exception developed over time in order to promote finality in commercial transactions and thus to encourage purchases and to foster commerce. It does so by protecting the title of a purchaser who acquires property for valuable consideration and who, at the time of the purchase, is without notice that the seller lacks valid and transferable title in the property.

*Lavin*, 942 F.2d at 185-86 (footnote and citations omitted). The court then found that the good-faith purchaser exception

name of his two Cayman Island corporations. The government alleged that Defendant obtained the funds that he wired to the Cayman Islands from several sources, but that most of the funds came from the refinancing of Defendant's apartment buildings.

## A. Claimant NRF

As to Claimant NRF, Defendant, on behalf of HMSI, obtained loans from NRF in the amount of approximately $2,000,000; one note dated August 27, 1997, was in the amount of $1,119,999, and the second note of the same date was in the amount of $1,126,000. These loans were secured by two mortgages given to NRF by HMSI; one mortgage on the Fox Run Apartment Complex, and the other mortgage on the RiverBend Apartment Complex. As part of the loan agreement, HMSI agreed that it would pay "prepayment consideration" to NRF if the loans were prepaid. NRF and the government stipulated that the prepayment consideration owed under the Fox Run note is $201,281.06, and the prepayment consideration owed under the RiverBend note is $200,029.77; however, while the government agrees that these are the amounts due as prepayment consideration, the government claims that the amounts are not recoverable by NRF as part of the forfeiture process. Under the terms of the notes, prepayment consideration becomes due and owing upon certain events including an "Event of Default" as provided in the agreement.

HMSI failed to make its August 1998, installment payment; in a letter dated August 20, 1998, NRF informed HMSI that it had not received its payment due August 1, 1998, on both the Fox Run and RiverBend loans, and that it had five days in which to make the payment in order to cure the default; otherwise, the failure to pay would be an event of default under the loan documents. HMSI did not cure its default and, according to NRF, the debt was accelerated on both loans.

Specifically, on August 26, 1998, NRF filed its amended complaint in foreclosure for declaratory judgment, and for appointment of a receiver against HMSI in the Court of Common Pleas of Lucas County, Ohio. On August 28, 1998, the Court of Common Pleas entered an order appointing Dennis Noneman as receiver of two apartment complexes that secured the debt owed to NRF.

In the criminal proceeding involving Defendant, on September 4, 1998, United States District Judge James G. Carr entered an order in aid of execution of seizure warrant as to Defendant's property. The Fox Run Apartment Complex and the RiverBend Apartment Complex were among the properties involved. Defendant was indicted on September 23, 1998.

On September 29, 1998, as a result of the government's seizure of the properties, NRF filed an amended complaint in foreclosure in its Ohio suit naming the United States of America as a party defendant. The government removed NRF's civil foreclosure action to the United States District Court for the Northern District of Ohio and, upon the government's motion, the civil foreclosure case, together with foreclosure cases filed by other innocent third party lenders including LNB, was transferred to United States District Judge David A. Katz, who had been reassigned to handle Defendant's criminal case.

### B.    Claimant LNB

As to Claimant LNB, Defendant, on behalf of HMSI, obtained four loans from Midland Loan Services, L.P. (for which LNB is the Assignee of all loan documents), each of which was secured by a mortgage on an apartment building and totaled approximately $15,000,000. The apartment complexes were named as the Hunt Club, the Windjammer, the Devonshire, and the Wellington House. The loans on the Hunt Club and the Windjammer complexes cross-collateralized both the Hunt Club and the Windjammer debts.

We are further guided in our conclusion based upon the fact that Claimants are *bona fide* purchasers for value under 21 U.S.C. § 853(n), as stipulated by the government, and that in passing § 853(n), Congress expressly carved out an exception for the rights of *bona fide* purchasers in the context of forfeiture proceedings. As the Third Circuit opined:

> As we read the relevant history, Congress did not intend section 853(n) to serve as a vehicle by which *all* innocent third parties who are aggrieved by an order of criminal forfeiture can petition for judicial relief. Rather, it seems to us that Congress, in enacting section 853(n)(6)(A) and (B), intended to accord standing to only two narrow classes of third parties, and intended to require all other third parties to petition the Attorney General for relief, *see* 21 U.S.C. § 853(i).

*United States v. Lavin*, 942 F.2d 177, 185 (3d Cir. 1991) (footnote omitted). The Third Circuit added that the Department of Justice and Congress agreed to carve out these limited exceptions because they were troubled by the former practice which required that "*'all* third parties, whether asserting a legal or equitable basis for relief from an order of criminal forfeiture, [were required to] pursue the remedy of petitioning the Attorney General for remission or mitigation of forfeiture.'" *Id.* (quoting S. Rep. No. 225, 98th Cong. 1st Sess. 208, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3390) (emphasis and alteration in *Lavin*). The two exceptions carved out by Congress in § 853(n)(6)(A) and (B) involve those instances "where the the petitioner had a legal interest in the property that, at the time of the commission of the acts giving rise to the forfeiture, was vested in him rather than the defendant or was superior to the interest of the defendant;" *id.* (quoting S. Rep. 225 at 3392), and "where the petitioner acquired his legal interest after the acts giving rise to the forfeiture but did so in the context of a *bona fide* purchase for value and had no reason to believe that the property was subject to forfeiture." *Id.* (quoting S. Rep. 225 at 3392).

720-21. "Among other things, a prepayment premium insures the lender against loss of his bargain if interest rates decline." *LHD Realty*, 726 F.2d at 330. Obviously, if lenders are sent a message that they will bear the risk of loss for the criminality of their borrowers – particularly when the lender is deemed a *bona fide* purchaser – then lenders will take measures designed to protect that risk of loss which will be borne by innocent borrowers, thereby making the government's policy argument weak.

In summary, the government's arguments are not supported by the analogous case law and fail to demonstrate the trend of the law in this area. Indeed, the government adamantly opposed the award of post-seizure interest, and attorney's fees and costs as provided in the loan agreements below; however, the district court was not persuaded by the government's claim where the circuits that have addressed the issue have held in favor of the lenders who expressly bargained for such provisions in the loan agreements. *See United States v. Real Prop. Located at 41741 Nat'l Trails Way, Daggett, Ca*, 989 F.2d 1089, 1091 (9th Cir. 1993); *United States v. Real Prop. Located at 2471 Venus Drive, Los Angeles, Ca.*, 949 F.2d 374, 377 (10th Cir. 1991); *United States v. Fed. Nat'l Mortgage Ass'n*, 946 F.2d 264, 266 (4th Cir. 1991) (affirming previous decision in *In re Metmor Fin., Inc.*, 819 F.2d 446, 448 (4th Cir. 1987) that innocent lienholders in a forfeiture proceeding are entitled to post-seizure interest and attorney's fees); *United States v. Six Parcels of Real Prop.*, 920 F.2d 798, 799 (11th Cir. 1991) (relying on *Metmor* to hold that the innocent lienholder was entitled to recover interest and principal). We believe that the same should hold true with regard to prepayment premiums, as bargained for by Claimants and Defendant, because Claimants should receive the benefit of their bargains. *See Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.,* 544 N.E.2d 920, 924 (Ohio 1989) (finding that it is not the court's function to rewrite the parties' contract).

The loans on the Wellington House and the Devonshire complexes were separate.

In September and October of 1998, LNB filed four foreclosure actions in Lucas County, Ohio, Common Pleas Court against HMSI after HMSI defaulted on its loan obligations, naming the United States of America as a party defendant in each action. The Common Pleas Court entered cognovit judgments in favor of LNB in three of the actions, awarding the full amount on three of the mortgages, including principal, interest at a default rate, and prepayment consideration. Specifically, on September 24, 1998, the court entered judgment in favor of LNB in the amount of $5,044,197.72 regarding the Hunt Club complex; on September 28, 1998, the court entered judgment in favor of LNB in the amount of $2,937,973.14 regarding the Windjammer complex; on October 23, 1998, the court entered judgment in favor of LNB in the amount of $2,362,906.18 regarding the Devonshire complex. The fourth foreclosure action, the one involving the Wellington House complex wherein LNB sought judgment in the amount of $4,456,957.71, was not reduced to judgment because of the government's intervention. Shortly after judgments were entered, the government moved to transfer the cases to the United States District Court, and the matter ultimately came before Judge Katz, whose decision is now the subject of this appeal.

On October 7, 1999, the government auctioned off the four apartment complexes involved in the LNB loan agreements, for a total sum of $15,080,000. The payoff figures to LNB, Trustee totaled $12,473,193.34, plus a few days of per diem interest, leaving the government with a profit of $2,606,806.66 on these properties. LNB claims that as of September of 1998, the time at which Defendant defaulted on the loans, the prepayment premiums owed to LNB totaled $2,889,314.54; however, LNB notes in its brief on appeal that because interest rates spiraled upward, the prepayment premiums were $1,300,356.91 in the Fall of 1999.

8   *United States v.*
    *Harris, et al.*

Nos. 99-4175/4269/4492

Nos. 99-4175/4269/4492

*United States v.*   13
    *Harris, et al.*

## DISCUSSION

We review a district court's findings of fact for clear error, and its conclusions of law *de novo* in this mixed issue of law and fact. *See Razavi v. Comm'r of IRS*, 74 F.3d 125, 127 (6th Cir. 1996); *see also Schroyer v. Frankel*, 197 F.3d 1170, 1173 (6th Cir. 1999).

The government's four main arguments as to why Claimants are not entitled to prepayment premiums are as follows: (1) because the transfer of the property to the government was involuntary, it did not trigger the prepayment premiums provision; (2) because the Claimants accelerated the loans, thereby demanding full payment in advance of the maturity date, Claimants cannot collect prepayment premiums; (3) even if Claimants were permitted to accelerate the loans and then collect prepayment premiums, Claimants could not do so here because they did not accelerate the loans until sometime after they learned of Defendant's crimes;[1] and (4) because the risk that lenders will lose prepayment premiums due to their borrowers' criminal conduct is a risk that is better borne by the lenders than by the victims of the crimes.

We disagree with each of the government's arguments where the case law that has spoken to prepayment premiums in general -- as well as other provisions for which an innocent lienholder has bargained -- does not support the government's position. As stated, the issue of whether an innocent lender is entitled to prepayment premiums as provided in the loan agreement upon the real property being forfeited to the government as a result of a criminal forfeiture proceeding against the debtor, is an issue of first impression in this circuit as well as the circuits across the country; however, when we apply analogous case law, although not directly on point, it

---

[1] Prior to oral argument, the government moved to withdraw its third argument, and we will therefore not consider it here.

long as the loan agreement provided for prepayment premiums upon acceleration of the debt by the lender, the prepayment premiums should be awarded. *See LHD Realty*, 726 F.2d at 330. Accordingly, because the case upon which the government relies did not account for the qualification of when the parties bargain for payment of prepayment premiums upon acceleration by the lender, a qualification that had been embraced by the courts long before that, and because the courts that have looked at the issue allow for the qualification, the government's second argument fails as did its first argument.

Finally, the government relies upon a policy argument that "the risk that lenders will lose prepayment premiums because their borrowers commit crimes is a risk that is better borne by the lenders than by the victims of the crimes." This policy argument may have some superficial appeal because in this case the federal Medicare program was defrauded, and it seems that providing the prepayment monies which the lenders seek to a program that cares for the well-being of the elderly is a good policy decision. However, such a policy argument cannot prevail in the face of clear provisions in the loan documents to the contrary, and case law establishing that such provisions are not unenforceable. Further, taking a more global look at this argument, denying lenders the prepayment monies that they bargained for (sums which are substantial) may force the lenders to take other measures to insure their bargained for payments. For example, lenders may screen loan applicants more carefully and not extend credit to an individual seeking to start a small business, or the lenders may increase fees associated with the loans to make up for the possible loss of these premiums.

"The clear purpose for a prepayment penalty is to compensate the lender for the risk that market rates of interest at the time of prepayment might be lower than the rate of the loan being prepaid. Such a provision would compensate the lender for anticipated interest that would not be received if the loan were paid prematurely." *Ridgewood*, 174 B.R. at

prior to the debtor filing a bankruptcy petition, the bankruptcy court for the Southern District of Ohio held that because the debt was never "prepaid" (due to the bankruptcy petition and bankrupt estate), it need not decide the issue of whether the prepayment premium was enforceable; however, the court also acknowledged that the prepayment premium would be due whether the prepayment was voluntary or involuntary, because the parties expressly bargained for it. *Id.*

Similarly, the federal circuit courts to have addressed prepayment premiums in general have found that prepayment premiums would be allowed in the case of acceleration of the debt by the lender if the parties had expressly provided for such in the loan agreement. *See Parker v. Plaza West Partners v. UNUM Pension & Ins.*, 941 F.2d 349, 355 (5th Cir. 1991) (noting that a prepayment premium would be upheld even where the lender accelerated the debt so long as the relevant provisions in the loan agreement were clear and unambiguous); *LHD Realty*, 726 F.2d at 330 (same); *see also MIE Md. Executive Park Gen. P'ship v. LaSalle Nat'l Bank*, No. 99-2066, 2000 WL 665645, at **2 (4th Cir. May 22, 2000) (unpublished *per curiam*) (finding that because the parties had bargained for the payment of prepayment premiums, the prepayment premiums survived the loan modification where the modification did not address the prepayment premiums agreement, while noting that prepayment premiums provisions are not "peripheral" and can amount to very substantial sums). Similarly, the unpublished case of *Eyde Brothers Development Co. v. Equitable Life Assurance Society*, No. 88-2197, 1989 WL 130632, at **3-**4 (6th Cir. Nov. 2, 1989) (unpublished *per curiam*), affirmed the district court's decision denying the lender's claim to prepayment premiums because, unlike the case at hand, the loan documents did not expressly provide for prepayment premiums in the event of acceleration.

Interestingly, the government relies upon *LHD Realty* in support of its first argument, but fails to mention that case in its second argument, likely because *LHD Realty* found that so

becomes evident that the government's arguments do not carry the day.

Although this issue is ultimately one of federal law under 21 U.S.C. § 853(n)(6)(B), both parties agree that Ohio law governs the outcome. As this Court stated in *United States v. Smith*,

> because forfeiture proceedings implicate property rights which have traditionally been measured in terms of state law, and because section 853 contains no rule for determining the scope of property rights, it is appropriate to refer to state law in determining the nature of the property interest involved in a forfeiture proceeding.

966 F.2d 1045, 1054 n.10 (6th Cir. 1992) (citations and internal quotation marks omitted).

The government accurately notes that the only case under Ohio law to speak to prepayment premiums, or prepayment consideration as the term is also known, in this regard is *LandOhio Corp. v. Northwestern Mut. Life Mortgage & Realty Investors*, 431 F. Supp. 475 (N.D. Ohio 1976). The government relies upon *LandOhio* in support of its first argument that "an involuntary transfer of property to the government cannot trigger a prepayment premium." However, we are not persuaded by the government's argument because it fails to accurately represent the holding of *LandOhio*, and instead relies upon only a select portion thereof.

*LandOhio* involved a taking under eminent domain where the mortgage lienholder sought prepayment consideration as provided in the lending agreement. *LandOhio*, 431 F. Supp. at 477-78. The district court noted that the Ohio courts had yet to speak on the issue and that under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), the court had a duty to determine what the Ohio courts would do if presented with this question. *LandOhio*, 431 F. Supp. at 479. The district court looked to a case from New Jersey which was factually

on point, particularly regarding the fact that like *LandOhio*, the lenders in the New Jersey case failed to include a provision as to the payment of prepayment premiums when the land was sold involuntarily before the note matured. *Id.* (citing *Jala Corp. v. Berkeley Savs. & Loan Ass'n of Newark, N.J.*, 250 A.2d 150 (N.J. Super. 1969)). The district court then adopted the *Jala* rule that "when the state coerces the sale of a mortgagor's property through the exercise of its condemnation power, the mortgagor is relieved of the contractual duty to render a prepayment premium to the mortgagee, unless the parties have explicitly agreed that such a payment shall be made even in the event that the mortgagor is forced to sell his property." *Id.* at 480 (citing *Jala*, 250 A.2d at 154).

The government cites only the portion of the *LandOhio* case wherein the district court held that a prepayment premium may not be assessed against a lienholder when the land is sold involuntarily, but fails to include the qualification of the "*Jala* rule" that "unless the parties have explicitly agreed that such a payment shall be made in the event that the mortgagor is forced to sell his property." *LandOhio*, 431 F. Supp. at 480. Indeed, the district court in *LandOhio* adopted the *Jala* rule in its entirety, including the qualification, and because Claimants in the matter at hand expressly provided for the payment of prepayment premiums even if the borrower were forced to sell the property[2], the government's argument that prepayment premiums are forbidden under *LandOhio* because the transfer in the matter at hand was involuntary fails. *See id.*; *see also* John C. Murray, *Enforceability of Prepayment-Premium Provisions in Commercial Loan Documents*, 442 Prac. L. Inst. 263, 296 (1999) (acknowledging the holding of *LandOhio* to include the qualification of the parties being able to specifically bargain

---

[2]Claimants bargained for the right to prepayment consideration, even in the event that Defendant lost ownership of the property through acceleration of the debt or foreclosure.

for the right to prepayment premiums in the case of an involuntary transfer).

We are not persuaded otherwise by the government's reliance on a case from the Seventh Circuit, *In re LHD Realty Corp.*, 726 F.2d 327, 330 (7th Cir. 1984), where, like the court in *LandOhio*, the Seventh Circuit explicitly held that the lender was not entitled to a prepayment premium because the lender accelerated the debt -- i.e., the prepayment was involuntary, and the prepayment clause did not clearly provide that the premium could be collected upon acceleration after default. Simply put, the Seventh Circuit would have allowed for the prepayment premium in the case of an involuntary transfer if the parties had expressly bargained for it. *Id.* The parties did bargain for it in the matter at hand.

This brings us to the government's next claim which is that "a lender may not accelerate a loan, thereby demanding full payment in advance of the maturity date, and also claim a prepayment premium." As noted, Claimants bargained for the right to prepayment consideration, even in the event that Defendant lost ownership of the property through acceleration of the debt or foreclosure. The government argues that under *Wide Scope, Inc. v. Freedom Fed. Savs. & Loan Ass'n*, 520 N.E.2d 35 (Ohio Misc. 2d.1987), Ohio law prevents the payment of prepayment premiums when the lender has accelerated the debt. We acknowledge *Wide Scope's* holding that "[i]f a lender requires payment in full, it may not also enforce a prepayment penalty[;]" however, *Wide Scope* (a decision from the Franklin County Municipal Court) failed to account for *LandOhio's* earlier qualification to the general premise that prepayment premiums are not allowed when the transfer is involuntary; namely, that the premiums will be allowed if the parties expressly bargained for the premiums under such circumstances. *See LandOhio*, 431 F. Supp. at 479-80. Moreover, as cited by Claimants, in *In re Ridgewood Apts. of Dekalb County, LTD*, 174 B.R. 712, 720-21 (Bankr. S.D. Ohio 1994), where the lender accelerated the entire debt