UNITED STATES of America

v.

Lawrence LAVIN.

Crim. A. No. 84–00388–01.

United States District Court,
E.D. Pennsylvania.

Aug. 2, 1990.

**1066**

U.S. Attorney's Office by Sonia C. Jaipaul, Philadelphia, Pa., for the Government.

Pierson, Ball & Dowd by Mark H. Tuohey, III, Washington, D.C., for WMOT Enterprises.

LOUIS H. POLLAK, District Judge.

This is a lawsuit brought pursuant to 21 U.S.C. Section 853(n). That section authorizes suits by third parties who are claiming "a legal interest in property which has been ordered forfeited to the United States." The statute is designed to create a remedy in favor of third parties whose legitimate legal interests have in some manner been swept up in property which has been forfeited to the United States ancillary to a federal criminal drug prosecution.

21 U.S.C. Section 853(n)(6) provides that "If, after the hearing, the Court determines that the petitioner has established by a preponderance of the evidence that (A) the petitioner has a legal right, title or interest in the property, and such right, title or interest renders the order of forfeiture invalid in whole or in part because the right, title or interest was vested in the petitioner rather than the defendant, or was superior to any right, title or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or (B) the petitioner is a bona fide purchaser for value of the right, title or interest in the property and was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under this section, the Court shall amend the order of forfeiture in accordance with its determination."

The present suit is one initiated by WMOT to recover from the United States approximately $355,000 of the property of Lawrence Lavin, which was forfeited by Lavin to the United States pursuant to his conviction, following a guilty plea of numerous drug offenses under Indictment Criminal Number 84–388–01. In pressing this claim, WMOT contends that its rights arise, and should be protected, under 853(n)(6)(B). That is to say, WMOT claims as "a bona fide purchaser for value of the right, title or interest in the property."

The essential facts that bear on WMOT's claim are these: WMOT, an enterprise that dealt in recordings and royalties thereto, ran into substantial cash flow problems in 1980. The management, unable to get such credit as seemed necessary to carry things forward, entered into an arrangement in December of 1980, under which one Mark Stewart was given 60 percent of the stock, and essential directive responsibility with respect to the company's affairs, although not evidently to the exclusion of other shareholders who continued as officers. It was Stewart's responsibility to provide additional funding, which he was able immediately to secure from Bank Leumi.

During 1981, specifically between January 8, 1981 and September 7, 1981, $1,440,000 of WMOT funds was transferred to a Bank Leumi account entitled, "Mark Stewart Real Estate Escrow Account." That $1,440,000 constituted a substantial part of approximately $3,354,000 deposited in that escrow account during the time period in question. During that time period in question, also, Mark Stewart transferred from the escrow account to Lawrence Lavin ap-

proximately $440,000. WMOT did not thrive, notwithstanding or perhaps because of Mark Stewart's attentive direction, and in 1982 it went into bankruptcy.

In September of 1984, WMOT was purchased, pursuant to a Chapter 11 plan of reorganization, by Alan Cohen, Michael Goldberg and Jeffrey and Mark Salverian, who remained the owners of WMOT to this day.

Shortly after the purchase of WMOT by the present owners, WMOT initiated a lawsuit against Bank Leumi and Mark Stewart, a lawsuit subsequently amended to include Lawrence Lavin. The intent of that lawsuit was to recover various sums allegedly diverted from WMOT wrongfully by the various defendants. That litigation resulted in a substantial settlement flowing from Bank Leumi to WMOT.

Meanwhile, Lawrence Lavin had been indicted on drug as well as tax charges. In February of 1985, WMOT sued in the bankruptcy court for a declaration that Dr. Lavin was then a fugitive, was indebted to WMOT, and that his property was to be subjected to a trust in WMOT's favor. Because Dr. Lavin was a fugitive, that lawsuit resulted in a default judgment which did indeed declare a constructive trust running from Lawrence Lavin and his wife Marsha Lavin in WMOT's favor, a constructive trust covering his properties, including, in particular, his real property, to guarantee a declared indebtedness of $355,-000.

Somewhat over a year later, Dr. Lavin was arrested, and, following the return of a superseding indictment, pled guilty to many crimes, and was duly sentenced both on the drug charges and on the separate tax evasion charges. Dr. Lavin is incarcerated under sentences which presumably will keep him in custody for many years.

Pursuant to the pleas of guilty, Dr. Lavin assented to forfeiture orders, which were duly entered, covering all of the many assets which had been identified and accumulated by Dr. Lavin; numerous bank accounts, real estate, et cetera. Receiving appropriate notice of the forfeiture order, WMOT thereupon initiated this proceeding.

WMOT has, over a series of hearing days, presented testimony and has today rested. The Government has moved for dismissal. Argument has been had.

The question to be addressed is whether WMOT made out a prima facie case establishing a claim under 21 U.S.C. Section 853(n)(6)(B). I stress (B) because WMOT has disavowed any claim under 21 U.S.C. Section 853(n)(6)(A). The reason WMOT makes no claim under (6)(A) is succinctly set forth in its prehearing memorandum. "The Government"—and this is at page ten—"The Government correctly observes that WMOT may not recover under 28 U.S.C. Section 853(n)(6)(A) because, under that action's 'relation-back provision,' the Government's interest in the forfeited estate vested when Lavin first committed the crimes giving rise to the forfeiture, which crimes occurred before WMOT obtained its putative interest in the forfeited estate."

The chronology referred to there is that encapsulated in the fact that the indictment, with respect to drug transactions to which Dr. Lavin pleaded guilty, alleged a conspiracy to deal in drugs commencing back in 1978, which is three years prior to the period in which Mark Stewart took WMOT funds and placed them in his own escrow account and concurrently transferred funds from that account to Dr. Lavin.

Petitioner, WMOT, then rests its case on Subparagraph (B). As already noted, the provision there is as follows: "The petitioner is a bona fide purchaser for value of the right, title or interest in the property and was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under this section."

The Government's first ground for challenging the case made out by petitioner is the claim that whatever interest WMOT may assert in Lavin's property, and by extension in what the Government now has pursuant to forfeiture, is not "a legal right, title or interest in the property" within the meaning of 21 U.S.C. Section 853(n)(6).

Now, the phrase "legal right, title or interest" is not to be found in Subpara-

graph (B), the bona fide purchaser paragraph under which WMOT sues. It is to be found rather in Subparagraph (A). But it seems plain that Subparagraph (B)'s reference to "the right, title or interest in the property" contemplates a reference to "a legal right, title or interest" as in Subparagraph (A); there is no reason to suppose that the two paragraphs are not symmetrical in this respect.

It is the Government's submission that WMOT's claim against Lavin is not a "legal right, title or interest" as against, at most, some equitable claim. In taking this position, the Government is essentially relying on what appears to be the Government's uniform position with respect to this statute, that an interest does not get to be sufficiently legal to be one cognizable under the statute unless the asserter of the interest is a secured creditor.

That status the Government does not behold as it views WMOT. WMOT, for its part, says that it enters court cloaked with the status of a judgment creditor, a formidable creditor status indeed. And, as already noted, it is the fact that WMOT has a judgment against Lavin entered by the bankruptcy court in the amount of $355,000, and an associated declaration of trust, a constructive trust in Lavin's real property, a judgment which was antecedent to the forfeiture order.

The Government has two difficulties with WMOT's reliance on its bankruptcy court judgment. One is that the judgment was a default judgment. And so, in the Government's view, there has not yet really been any demonstration, except by the bankruptcy court's validation of the uncontroverted claim of WMOT, that WMOT has any claim against Dr. Lavin.

The second difficulty that the Government has with the default judgment is this. The Government contends that, to the extent that WMOT relies on its default judgment, a judgment which was entered in March of 1985, WMOT is barred from pressing its claim against the United States, because by March of 1985 WMOT—which is for the moment to say those who purchased the company in September of 1984—concededly had acquired sufficient knowledge of Lavin's activities to know, within the meaning of Subparagraph (B), "that the property was subject to forfeiture."

It is WMOT's position that the purchasers of WMOT were wholly unaware of Lavin, let alone his connections with WMOT, at the time, in September of 1984, when they acquired WMOT. But it appears that, on the record made in this court, that information about Lavin was available by the time of the default judgment.

The question of the time at which knowledge "that the property was subject to forfeiture" becomes pertinent for our purposes may be deferred for a moment. The immediate question is whether the interest that WMOT is asserting as against Lavin is an interest of sufficient dignity as to be characterizable as a "legal right, title or interest."

It is WMOT's position that the fact of the bankruptcy court's judgment is not an essential ingredient in demonstrating that the interest is a "legal right, title or interest," but that it tends to underscore the strength of that interest.

▪ I am satisfied that the entry of the default judgment establishes under Pennsylvania law an interest of sufficient dignity as to be regarded as "a legal right, title or interest" for the purposes of 21 853(n)(6). The dignity which Pennsylvania law would assign to a judgment is, I think, illustrated by *In Re: Upset Sale, Tax Claim Bureau of Berks County*, 505 Pa. 327, 479 A.2d 940, 945 (1984).

▪ The default judgment is entitled to respect in this proceeding or in any other. The degree of respect is, however, in my judgment, tempered by the fact that it was a default judgment in this sense. Were it a judgment that flowed from full litigation, it would surely be preclusive as to all matters litigated or litigable in any subsequent litigation between the parties or those who stand privy thereto. Even as a default judgment, it would bind the parties and those privy thereto as an ordinary matter.

I'm not prepared, however, to say that the United States, notwithstanding that its interest is derivative from Lavin, would or should be precluded from litigating what underlies that judgment, where the judgment clearly is presumptively soundly based.

Accordingly, for my purposes, what we have here is a default judgment, which on its face gives WMOT a claim which, under Pennsylvania law, and hence for the purposes of this statute under federal law, is a legal claim against Dr. Lavin and his properties. I do not, however, regard it as a claim irrebuttably soundly based. And if the exigency of litigation calls for it, I would regard the United States as entitled to offer proof that, in fact, WMOT's claim against Lavin was an unavailing one.

As things stand at this stage, where plaintiff has presented its proof, and the Government has at this point not offered anything, I find no ground for simply disregarding the default judgment. At the same time, noting that there has been some evidence presented as to the nature of the underlying transaction which gave rise to the default judgment, and bearing in mind that petitioner takes the position that the office of the default judgment in this litigation is essentially to strengthen its claim— to give added evidentiary support to its claim rather than to be by itself the entire platform on which WMOT relies—(a position which would be difficult for WMOT since it would then make more pressing the question of WMOT's knowledge at the time of the entry of the default judgment)—it appears to me reasonable to assess whether the record, taken as a whole as it stands, now gives prima facie support to the WMOT position that it has, within the meaning of the statute, a "legal right, title or interest in the property."

We know merely that the evidence, in whatever form submitted to the bankruptcy court, persuaded that court that WMOT had an entitlement in the amount of $355,000 against Lavin. We know from the evidence presented in this court that Lavin was the transferee of $440,000 from Stewart via the Stewart Escrow Account at a time at which there had been transferred into the Stewart Escrow Account $1,440,000 of WMOT funds.

The Government suggests that there is nothing in that statement of facts which attaches any impropriety at all to Lavin, or indeed that connects Lavin and WMOT. The Government's proposal is that the record can well be read to support the conclusion that total disjunction between Lavin and WMOT is supported at least in some measure by the further fact that the $1,440,000 of WMOT funds that was transferred to the escrow account between January and September of 1981, was only a portion of a substantially larger amount of money deposited in the escrow account during that time period. To be precise, an approximate total of $3,354,000 was deposited in the escrow account between January and September of 1981, which means that moneys from WMOT to the Stewart Escrow Account amounted to somewhat less than half of the total deposited in the Stewart Escrow Account in that period.

Needless to add, the record says nothing at all about whether there may have been any other sums moving into or out of the escrow account during that time period.

■ The Government further takes the position that the record does not even tell us that the transfer of funds from WMOT to the escrow account was an improper transfer. The Government points out that Stewart was, pursuant to the agreement made in December of 1980, in full charge of WMOT, had authority, signing authority, with respect to all of WMOT's banks and so forth. So the Government would have us understand that the evidence of record does not support an inference that the transfer of WMOT funds out to the Stewart Escrow Account was in any way inappropriate.

The Government's argument on that score simply takes no account of the testimony of Messrs. Bernstein and Rubens, who have been co-presidents of WMOT and also shareholders, that transactions of the kind described, sending large sums of WMOT money to the Stewart account, were not contemplated by any authority

that they had participated in conferring on Stewart.

The Bernstein/Rubens testimony is confirmed by Mr. Ganz's testimony as trustee. He examined what records were available to him, and on the basis of those records drew the strong inference that Stewart was engaged in what, for lack of a better word, would be referred to as embezzlement of WMOT funds.

So it seems clear that WMOT has presented a sufficient evidentiary basis for concluding that at least the transfers of funds out of WMOT accounts and into the Stewart Escrow Account were a wrong as against WMOT.

■ We are, however, the Government insists, left with a gap as to Lavin. There is nothing, the Government contends, that connects Lavin with the Stewart embezzlement. That strikes me as too narrow a reading of the record.

The record, as it stands before this court, putting aside whatever may have been shown to the bankruptcy court, does show the receipt by Lavin of $440,000 within the time period in which $1,440,000 of WMOT funds were disbursed to the Stewart account without, as the record shows, any authority. As I have noted, there were other funds, some—well, close to $2,000,000 worth of other funds—that were deposited in the escrow account at the same time, and we have no basis for concluding that those additional funds derived from illegal activities, or at least illegal activities involving the siphoning off of WMOT funds.

It is, of course, entirely possible that all of the moneys received by Lavin from the Stewart Escrow Account were for entirely legitimate purposes and did not derive in any way from the WMOT funds. It is also possible that they were derived from—at least in part—from illegitimate purposes and transactions, and still did not come from WMOT funds. In either of those circumstances, WMOT would not have demonstrated a claim against Lavin.

But the record is simply silent on that, and at this stage we are examining wheth-er the petitioner has demonstrated prima facie some form of claim against Lavin. I conclude that it would not be implausible for a fact-finder to conclude that that proportion of the $440,000 transferred to Lawrence Lavin from the Stewart Escrow Account, which the WMOT funds, $1,440,000, bear to be the total funds deposited into the account, $3,354,000, were funds that had their source with WMOT. Such a conclusion would yield a claim of somewhere in the neighborhood of $200,000 against Lavin. I attach no special significance to that number, certainly not to suggest it as a finding of fact.

At this stage, I'm only positing that petitioner has offered enough to show prima facie that it has a claim of a sort against Lavin for a wrong done by Lavin, in association with Stewart, in depriving WMOT of funds that belong to WMOT.

■ Having reached this conclusion, we then turn to the further aspects of petitioner's claim. The petitioner must show that it "is a bona fide purchaser for value of the right, title or interest in the property and was at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture under this section."

The questions that would need to be addressed would be whether the transaction, pursuant to which WMOT acquired "the right, title or interest" that has been discussed, is a transaction of a kind which is properly describable as a bona fide purchase; and, if so, whether, "at the time of purchase," the petitioner can be said to have been "without cause to believe that the property was subject to forfeiture." Both of those matters are matters to be proved by petitioner. The question arises whether petitioner has made a prima facie showing of both of those elements.

If we address first the question of the time of purchase, we note that petitioner is essentially pleading in the alternative. Petitioner recognizes that to tie "the time of purchase" to the date of the default judgment would be fatal to its claim because, as I have noted, by then it had sufficient

knowledge of Lavin's activities so as to be disqualified.

Petitioner takes the position then that its "purchase" was effectuated either in September of 1984, when Mr. Cohen and the Messrs. Salverian and Mr. Goldberg purchased WMOT pursuant to the plan of reorganization, or in 1981, when Stewart was fleecing WMOT, and, as alleged, handing over some of that ill-gotten gain to Lavin. Both of those alternatively offered dates of purchase would be early enough so that at least the persons who purchased WMOT would appear to have been entirely without any knowledge of Lavin and his criminal activities.

The perception of the purchase, as having taken place in September of 1984, is an appealing one in the sense that something was purchased in our conventional understanding of the phrase at that time. WMOT was bought by Mr. Cohen, Mr. Goldberg and the Messrs. Salverian. It is not, however, apparent to me why that transaction should be regarded as having some legal significance for the purposes of this litigation. The claim being asserted against Lavin—and for our current purposes, against the Government—is a claim by WMOT. It is not a claim belonging to Mr. Cohen and/or Mr. Goldberg and/or the Messrs. Salverian.

In the view I take of this case, if WMOT has a cognizable claim against Lavin, it is a claim assertible by way of claim against the forfeited property, without regard to whether WMOT was sold in the course of the reorganization proceedings to persons other than persons previously connected with WMOT.

To be sure, the fact of the September 9, 1984 purchase tends to show, at least on this record, that the new owners of WMOT were people who were unacquainted with Lavin or his activities. But if, for purposes of discussion, we assume that, Stewart apart, those involved in WMOT were unaware in 1981 that crime was afoot and that Stewart was perpetrating it to the detriment of WMOT and with the participation of Lavin, it is hard to see why WMOT would be precluded from pursuing

that claim. I do not mean to say that there may not be issues that can be posed as to whether WMOT was so much Stewart that WMOT was, in effect, entirely infected with Stewart's total knowledge. But that is a set of issues that go beyond anything that need to be resolved here today.

My immediate point is that the transfer of interest in September of 1984 of the bankrupt company does not seem to me a legally consequential event for our purposes. If WMOT was chargeable with guilty knowledge of Stewart's and Lavin's activities prior to September of 1984, I would not see why the arrival on the scene of a group of purchasers of WMOT, who themselves were unaware of that past history, would create a legal claim that did not exist.

In any event, I would point out that the statute talks about "a bona fide purchaser for value of the right, title or interest in the property." Mr. Cohen, Mr. Goldberg and Messrs. Salverian were purchasers of WMOT, and it is WMOT which is, within the meaning of the statute, "the petitioner," the entity which is under the statute to be the "bona fide purchaser."

And so I think it is WMOT's interest that we should be focusing on. I put aside, for these reasons, the September 1984 purchase of WMOT by Mr. Cohen and the Messrs. Salverian and Mr. Goldberg as being a purchase within the meaning of our statute.

■ If we turn then to 1981, and ask whether the events which took place in that year can be characterized as constituting a bona fide purchase within the meaning of the statute, we are told by petitioner that the payment into the Stewart escrow account—and by extension the further transfer of what, by hypothesis, we are led to believe would be some portion of that on to Lavin—of WMOT funds, constituted, from WMOT's point of view, a transfer from WMOT to Lavin of a thing of value. In return—it would appear to complete the concept of purchase—that what WMOT received was a claim, or, as each payment went out, a series of claims against Lavin, a series of claims aggregating in the

"right, title or interest," a recovery for which is sought here. So to characterize the 1981 event seems to me to put pressure on the language of the statute beyond what it would reasonably bear.

Congress has offered very little direction as to what is meant by the concept of "bona fide purchaser for value of the right, title or interest" within the meaning of this statute. The decided cases—and there are very few of them—construing either this language or the identical language of the RICO legislation, offer not much more to go on except the strong injunction that the language should be liberally construed. A liberal construction, we would understand, would be one that looks toward generosity towards claimants with a view to preventing the Government's sweeping power of forfeiture from pulling away properties that really, in all propriety, should not have been attributed to the criminal, but properly belonged to others.

The decided cases—the *United States v. Reckmeyer* litigation, 836 F.2d 200 (4th Cir. 1987), *United States v. Mageean*, 649 F. Supp. 820 (D.Nev.1986), affirmed 822 F.2d 62 (9th Cir.1987), and *United States v. Campos*, 859 F.2d 1233 (6th Cir.1988)—address what has been a continuing issue of whether, as the Government uniformly asserts, one must be a secured creditor to present oneself in the posture of bona fide purchaser of a statutorily cognizable "right, title or interest"; or whether, as private claimants have contended, unsecured creditors, including especially trade creditors, have sufficient standing to proceed. *Reckmeyer* and *Mageean* have rejected the Government's proposed limitation to secured creditors. *Campos* has accepted that view.

Although there is little uniformity about these cases, they do involve advertent transactions, the interfamilial loan in *Reckmeyer*, for example. The decided cases do not offer instances in which a claim which arises inadvertently is found to be cognizable under 21 U.S.C. Section 853.

In distinguishing between advertent and inadvertent transactions, what I really have in mind is the broad difference which we ordinarily characterize as the difference between contractual and tortious obligation. Insofar as I'm aware, there are no cases in which a tort claim has been found to be a claim which fits within 21 U.S.C. Section 853(n)(6)(B)—that is a kind of a "right, title or interest" which at its creation generates the bona fide purchaser status called for by the statute.

The use of the phrase "bona fide purchaser" seems to me to connote a legislative intention to focus on the intentional transaction, the intentional creation of some sort of business relationship, as distinguished from the obligation which arises when one person's automobile strikes another person's automobile, or when one person embezzles money from another.

The ingredient of intentionality, which seems to me connoted by the very use of the term purchaser, especially when connected with bona fide, seems to me strengthened by the further statutory concern with the degree of knowledge that the purchaser had at the time of purchase that the property might be subject to forfeiture. Those are not concerns, it strikes me, that a legislature would ordinarily have in mind if it were thinking about the creation of legal obligations of a tort-based nature.

In so characterizing what I think is contemplated by Subparagraph (B), I do not mean to suggest that one could not have an advertent purchase of an antecedent claim, which claim arose from a tort. Such a claim could be assignable and marketable like any other. But I do not find within the statute that the activity of Messrs. Stewart and Lavin, assuming it to be that which petitioner contended it to have been, in embezzling funds from WMOT, constituted by itself a "bona fide purchase" by WMOT of a right, title or interest in Dr. Lavin's property.

My view of this construction of Subparagraph (B) is, I would add, only strengthened by contrasting its language with the language of Subparagraph (A), on which the petitioner does not rely. There, it would seem to me entirely possible that the range of legal rights or titles or interests that might prove to have been vested in the

petitioner rather than in the defendant, or, as it were, at least superior in the petitioner rather than the defendant, could include rights, titles or interests that did not arise in the advertent transactional sense that I suggest must characterize the concept of purchase, if Subparagraph (B) is to be given some coherent reading.

The effect of what I have concluded is that the petitioner's proof is not adequate to serve as a basis for a finding by a fact-finder that the embezzlement by Stewart, in association with Lavin, which I assume for purposes of discussion to have taken place, gave rise to a bona fide purchase by WMOT from Lavin of a right, title or interest in Lavin's property within the meaning of 21 U.S.C. Section 853(n)(6)(B).

Accordingly, I shall grant the Government's motion and dismiss the petition. In doing so, I would note that petitioner is not necessarily without all remedy. The forfeiture statute contemplates that claimants may be able to proceed administratively by application to the Attorney General for recoveries that cannot be brought within the very limited statutory rubric. It would, of course, be beyond my purview to consider whether this petitioner's claim is one that would fit within the administrative remedial framework.

I have thought, however, that, for completeness sake, it would be appropriate for me to note that alternative pathway as I announce my ruling that plaintiff's submission to this court is insufficient as a matter of law to warrant calling on the Government to offer evidence on the other side of the case.

So, for the reasons stated, I will enter a written order dismissing the petition, and I will at this time express my great gratitude to counsel for all of your patience in this extended proceeding up to now; and, most particularly, for your astonishing patience this afternoon in sitting, and at least purporting to listen to my very extended disposition of this case.

Thank you.