UNITED STATES of America

v.

Lawrence W. LAVIN

WMOT Enterprises, Inc., Appellant.

No. 90–1743.

United States Court of Appeals,
Third Circuit.

Argued March 4, 1991.

Decided Aug. 6, 1991.

Alexander P. Starr (argued), Mark H. Tuohey, III Reed Smith Shaw & McClay, Washington, D.C., for appellant.

Michael M. Baylson U.S. Atty., Sonia C. Jaipaul (argued), Asst. U.S. Atty., Chief, Financial Litigation Div., U.S. Dept. of Justice, Philadelphia, Pa., for appellee.

Before BECKER, NYGAARD and HIGGINBOTHAM, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

This appeal derives from the criminal prosecution of Dr. Lawrence Lavin for federal drug and tax offenses. As part of Lavin's criminal sentence, the district court entered a forfeiture order encompassing all of his property derived from drug activity. Appellant WMOT Enterprises, Inc. ("WMOT") thereafter petitioned the court under 21 U.S.C. § 853(n)(6) to amend its forfeiture order. WMOT asserted that Lavin, together with one Mark Stewart, embezzled a large sum of money from the company, thus giving the company an interest in Lavin's forfeited property. However, because Lavin's drug trafficking began a full three years before the embezzlement, WMOT conceded that its interest in Lavin's forfeited property is superior to that of the government only if it is a "bona fide purchaser for value" under section 853(n)(6)(B). The district court held that "bona fide purchaser" status under subsection (B) arises only through *advertent* business transactions. Since WMOT acquired its interest in Lavin's estate through an *inadvertent* transaction (viz. embezzlement), the court dismissed WMOT's petition, and this appeal followed.

WMOT's appeal presents two issues, one jurisdictional and the other statutory. At the outset, we must determine whether a proceeding under section 853(n)(6) is criminal in nature, in which case Fed.R.App.P. 4(b) allows only ten days to appeal, or whether it is civil in nature, in which case Fed.R.App.P. 4(a)(1) allows sixty days to appeal if the United States is a party. The government argues that, because the district court's forfeiture order was part of Lavin's criminal sentence, a proceeding to amend that order is criminal, and WMOT's notice of appeal, which was filed fifty-four days after the district court dismissed its petition, was untimely filed under Rule 4(b). We disagree, and hold that a proceeding under section 853(n)(6) is civil in nature, and hence that WMOT's appeal was timely filed under Rule 4(a)(1).

On the merits, we agree with the district court that a victim of embezzlement lacks standing to petition the court under section 853(n)(6)(B). In light of the relevant statutory language, legislative history, and decided cases, we hold that, in order to qualify as a "bona fide purchaser" under subsection (B), the petitioner must acquire its interest in the forfeited assets through an advertent, contractual transaction, as opposed to an inadvertent, tortious transaction like embezzlement. We therefore will affirm the district court's dismissal of WMOT's petition under section 853(n)(6)(B).

## I. FACTS AND PROCEDURAL HISTORY

WMOT, incorporated in Pennsylvania in 1971, originally was engaged in the business of producing musical recordings and leasing the rights to those recordings in exchange for royalties. In late 1980, WMOT began to experience a severe cash flow crunch. Unable to obtain sufficient credit, WMOT entered into an agreement with TEC Records, Inc. ("TEC Records"), a Pennsylvania corporation controlled by Mark Stewart. Under the agreement, TEC Records acquired 60% of WMOT's stock in consideration for its assumption of all of WMOT's outstanding liabilities. In addition, Stewart, who was able to secure a line of credit for WMOT from Bank Leumi Le-Israel B.M. ("Bank Leumi"), assumed effective control of the company, becoming both an officer and the chairman of its board of directors.

Stewart's arrival at WMOT precipitated the company's downfall. Between January and September of 1981, Stewart deposited approximately $3,354,000, including $1,440,000 of WMOT funds, into an account at Bank Leumi denominated the Mark Stewart Real Estate Escrow Account ("Escrow Account"). Stewart's deposits of WMOT funds were made without the knowledge or approval of WMOT's other officers and directors. During this very same time period, Stewart transferred approximately $440,000 from the Escrow Account to Dr. Lawrence Lavin. Lavin used this money to purchase such items as luxury dwellings, an automobile, a swimming pool, and a seat on the Philadelphia Stock Exchange.

Because of Stewart's predations, WMOT was forced to file a Chapter 11 bankruptcy petition in 1982. Alan Cohen, Michael Goldberg, and Jeffrey and Mark Salverian, WMOT's present owners, purchased the company in November of 1984 pursuant to a plan of reorganization. At the time of the purchase, WMOT's recording business was virtually defunct. The primary asset of the company therefore was a potential cause of action against Bank Leumi and Stewart to recover the funds that had been diverted from WMOT in 1981. WMOT filed this lawsuit on November 2, 1984, and a few days later, amended its complaint to include Lavin. WMOT eventually settled with Bank Leumi for approximately $1.3 million.

Meanwhile, Lavin was indicted on federal drug charges on September 10, 1984, and on October 1, 1984, was indicted on federal tax charges. He was released on bail and, shortly afterward, became a fugitive. In February of 1985, WMOT brought a separate action in bankruptcy court against Lavin and his wife, Marcia, seeking a declaration that Lavin was a fugitive and was indebted to WMOT. This lawsuit resulted in a default judgment being entered against the Lavins in the amount of $355,-

385.71. The bankruptcy court also ordered that the Lavins be deemed constructive trustees for the benefit of WMOT of all real property titled in their names.

Over a year later, Lavin was apprehended. Following the return of a superseding indictment, he pled guilty to violating federal drug and tax laws, 21 U.S.C. §§ 848, 846 and 843(b), and was sentenced to twenty-two years in prison. As part of his plea agreement, Lavin agreed to forfeit all of his property associated with or derived from his drug activity. He specifically agreed to forfeit certain assets, such as real estate holdings and numerous bank accounts, that he previously had identified to the FBI as proceeds from his drug trafficking and that were listed in an addendum to his plea agreement. At sentencing, the district court entered an order of forfeiture under 21 U.S.C. § 853 encompassing these enumerated assets.

Seven months later, WMOT petitioned under 21 U.S.C. § 853(n) for a hearing to adjudicate the validity of its interest in Lavin's forfeited property. The petition requested that the forfeiture order be amended so that $355,385 of the assets seized by the government as proceeds from drug trafficking would be turned over to WMOT in satisfaction of its default judgment against the Lavins. The government responded by moving to dismiss WMOT's petition for lack of standing under 21 U.S.C. § 853(n)(6).

## II. THE DISTRICT COURT'S OPINION

Title 21 U.S.C. § 853(n)(6) recognizes certain third-party interests in assets that are subject to forfeiture. More specifically, section 853(n)(6) instructs the district court to amend its order of forfeiture if a petitioner demonstrates by a preponderance of the evidence that:

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section. . . .

The sole issue confronting the district court was whether WMOT had established a prima facie case under subsection (B), for WMOT disavowed any claim under subsection (A).[1] To make out a prima facie case under section 853(n)(6)(B), the petitioner must demonstrate that: (1) it had a legal "right, title, or interest in the [forfeited] property;" (2) it was a "bona fide purchaser for value of the right, title, or interest in the [forfeited] property;" and (3) it was "at the time of the purchase reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B).

With respect to the first requirement, the district court held that WMOT had, at this juncture, adduced sufficient proof to establish a prima facie case that WMOT had a legal "right, title, or interest" in Lavin's forfeited property.[2] The court next exam-

---

**1.** The reason WMOT asserted no claim under section 853(n)(6)(A) was stated succinctly in WMOT's prehearing memorandum:

"The Government correctly observes that WMOT may not recover under 28 [sic] U.S.C. Section 853(n)(6)(A) because, under that [section's] 'relation-back provision,' the Government's interest in the forfeited estate vested when Lavin first committed the crimes giving rise to the forfeiture, which crimes occurred before WMOT obtained its putative interest in the forfeited estate."

745 F.Supp. 1065, 1067 (E.D.Pa.1990). As suggested above, the indictment to which Lavin pled guilty alleged a drug conspiracy commencing in 1978, a full three years before Stewart allegedly embezzled funds from WMOT, deposited them in the Escrow Account, and then transferred funds from that account to Lavin.

**2.** In particular, the court concluded that "the entry of [a] default judgment establishes under Pennsylvania law an interest of sufficient dignity as to be regarded as 'a legal right, title or interest' for the purposes of 21 [U.S.C. § ]

ined whether the transaction whereby WMOT acquired its legal interest in Lavin's forfeited property constituted a "bona fide purchase[ ] for value." As a preliminary matter, the court had to identify the relevant "purchase." WMOT argued that the "purchase" occurred in September of 1984, when the present owners of WMOT purchased the company pursuant to the plan of reorganization. The district court, however, rejected this theory, emphasizing that the claim against Lavin's property belonged to WMOT, not its present shareholders:

> [I]f WMOT has a cognizable claim against Lavin, it is a claim assertible by way of [a] claim against the forfeited property, without regard to whether WMOT was sold in the course of the reorganization proceedings to persons other than persons previously connected with WMOT.

*Id.* at 1071.[3] The district court instead concluded that the operative "purchase" occurred in 1981 when Stewart allegedly transferred to Lavin the funds that he had embezzled from WMOT. Neither party appeals these two aspects of the district court's ruling.

Turning to the events of 1981, the district court rejected WMOT's contention that Stewart's siphoning of funds from WMOT accounts and subsequent transfers to Lavin constituted a bona fide purchase within the meaning of the statute. The court stated: "[T]o [so] characterize the 1981 event[s] seems to me to put pressure on the language of the statute beyond what it would reasonably bear." *Id.* at 1072. Noting that Congress has offered very little guidance as to the meaning of the phrase "bona fide purchaser for value," the district court turned to the three decided cases that have construed this language,

*see United States v. Campos,* 859 F.2d 1233 (6th Cir.1988); *United States v. Reckmeyer,* 836 F.2d 200 (4th Cir.1987); and *United States v. Mageean,* 649 F.Supp. 820 (D.Nev.1986), *aff'd,* 822 F.2d 62 (9th Cir. 1987).

Although these cases primarily address a slightly different question—i.e., whether a general, unsecured creditor can have a "legal right, title, or interest" in forfeited property—the district court found a common thread running through all of them. 745 F.Supp. at 1072. They all involved what it described as advertent (as opposed to inadvertent) transactions. The court stated:

> The decided cases do not offer instances in which a claim which arises inadvertently is found to be cognizable under 21 U.S.C. Section 853(n)(6)(B).
>
> In distinguishing between advertent and inadvertent transactions, what I really have in mind is the broad difference ... between contractual and tortious obligation. Insofar as I'm aware, there are no cases in which a tort claim has been found to be a claim which fits within 21 U.S.C. Section 853(n)(6)(B)....

*Id.*

The court also reasoned that Congress's use of the phrase bona fide purchaser "connote[s] a legislative intention to focus on the intentional transaction, [that is,] the intentional creation of some sort of business relationship, as distinguished from the obligation which arises ... when one person embezzles money from another." *Id.* "The ingredient of intentionality," the court determined, is underscored by the "statutory concern with the degree of knowledge that the purchaser had at the time of the purchase." *Id.* Congress, the district court believed, would not have been concerned with whether the purchaser was

853(n)(6)." *Id.* at 1068. The court remarked, however, that the government would be entitled, if it should prove necessary, to present evidence that WMOT in fact lacked a valid claim against Lavin's forfeited property.

**3.** The court further remarked:
  [T]he transfer of interest in September of 1984 of the bankrupt company does not seem to me a legally consequential event for our

purposes. If WMOT was chargeable with guilty knowledge of Stewart's and Lavin's activities prior to September of 1984, I would not see why the arrival on the scene of a group of purchasers of WMOT, who themselves were unaware of that past history, would create a legal claim that did not exist. *Id.*

at the time of the purchase without cause to believe that the property was subject to forfeiture "if it were thinking about the creation of legal obligations of a tort-based nature." *Id.* The court thus held that Stewart's and Lavin's embezzlement of funds from WMOT did not constitute in and of itself a "bona fide purchase" by WMOT of a right, title, or interest in Lavin's property. *Id.* For these reasons, the district court dismissed WMOT's petition to amend the order of forfeiture.

The court, for the sake of completeness, called to WMOT's attention the existence of an alternative, administrative remedial framework—to wit, a petition for remission or mitigation to the Attorney General, *see* 21 U.S.C. § 853(i) (empowering the Attorney General to grant petitions for mitigation or remission of criminal forfeiture orders); 28 C.F.R. Part 9 (procedures promulgated by the Attorney General, pursuant to this grant of statutory authority, that make this remedy available). This appeal followed.

## III. JURISDICTION

■ Before proceeding to the merits of WMOT's appeal, we must dispose of a threshold challenge to our jurisdiction. WMOT filed its notice of appeal fifty-four days after the district court entered its order dismissing WMOT's petition under section 853(n). The government now contends that WMOT's appeal is untimely under Fed.R.App.P. 4(b). Rule 4(b) provides in pertinent part: *"In a criminal case* the notice of appeal by a defendant shall be filed in the district court within 10 days after the entry of ... the judgment or order appealed from...."* (Emphasis added). The government maintains that WMOT's appeal was taken "in a criminal case," and that it therefore was filed after the appeal time set forth in Rule 4(b) had expired.

In contrast, WMOT asserts that Rule 4(b) is inapplicable because it is not appealing "in a criminal case." WMOT instead contends that it is appealing from a judgment entered "in a civil case," and that the time for appeal accordingly is controlled by Fed.R.App.P. 4(a)(1). Because Rule 4(a)(1) provides that a notice of appeal must be filed within sixty days if the United States is a party,[4] WMOT insists that its appeal was timely filed.

Whether an appeal from an order dismissing a petition under 21 U.S.C. § 853(n) is governed by Rule 4(b) or Rule 4(a)(1) is, surprisingly, a question of first impression. The government's position on this issue is straightforward. It concedes that this is not an appeal from a criminal conviction, but asserts that it is nonetheless an appeal "in a criminal case." The government emphasizes that the instant appeal is from a dismissal of WMOT's petition to amend the order of forfeiture, which the district court entered as part of its sentence of Lavin. WMOT, on the other hand, construes the phrase "in a criminal case" much more narrowly. It asserts that the shorter appeal time prescribed by Rule 4(b) applies only to appeals taken from criminal *prosecutions,* and that, as a result, appeals taken from a proceeding under 21 U.S.C. § 853(n) are governed by the more generous appeal period of Rule 4(a)(1). Having reviewed the jurisprudence, we subscribe to WMOT's narrower construction of Rule 4(b).

The term "criminal case" in Rule 4(b) generally is construed narrowly to encompass only "a prosecution brought by the government to secure a sentence of conviction for criminal conduct." 9 J. Moore, B. Ward, & J. Lucas, *Moore's Federal Practice* ¶ 204.15, at 4–132 (2d ed. 1991). Conversely, the term "civil case" in Rule 4(a)(1) generally is construed broadly to include "any action that is not a criminal *prosecution.*" *Id.* ¶ 204.08[1], at 4–29. As a re-

---

**4.** Rule 4(a)(1) states in pertinent part:
*In a civil case* in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal ... shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from; but *if the United States or an officer or agency thereof is a party, the notice of appeal may be filed by any party within 60 days after such entry.* (Emphases added).

sult, proceedings that essentially are civil in nature are deemed to be "civil cases," even though they derive from a prior criminal prosecution. For example, habeas corpus cases, proceedings to vacate a sentence under 28 U.S.C. § 2255, and actions dealing with the forfeiture of a criminal bail bond all are "civil" for purposes of Rule 4(a)(1). *See id.* ¶ 204.08[1], at 4–30—4–31.

Applying these principles to the case at bar, we are convinced that a proceeding under 21 U.S.C. § 853(n), which is closely analogous to a bail forfeiture proceeding, is a "civil case" for purposes of Rule 4(a)(1).[5] As the government concedes, a hearing to adjudicate the validity of a third party's interest in forfeited property is not a criminal *prosecution,* i.e., an action commenced by the government to secure a sentence of conviction for criminal conduct. In fact, petitioners such as WMOT are barred by 21 U.S.C. § 853(k)(1) from intervening in the true "criminal case."[6] Given that our decision in this appeal will have absolutely no effect on Lavin, the criminal defendant, we think that the government strains reason in attempting to characterize a proceeding under section 853(n) as a "criminal case."[7] We therefore hold that WMOT's notice of appeal, which was filed fifty-four days after the entry of the order appealed from, was timely under Rule 4(a)(1). We turn now to the merits: whether WMOT's status as a victim of embezzlement was sufficient to confer standing under 21 U.S.C. § 853(n)(6)(B).

**5.** *See United States v. Brouillet,* 736 F.2d 1414, 1415 (10th Cir.1984) (*en banc*) (holding that "the time for appeal from an order relating to the forfeiture of a criminal bail bond is governed by the rules for appeals from a civil case").

**6.** Section 853(k) provides:
Except as provided in subsection (n) of this section, no party claiming an interest in property subject to forfeiture under this section may—
(1) intervene in a trial or appeal of a criminal case involving the forfeiture of such property under this subchapter....

**7.** The government itself, in arguing to the district court that it should draw a negative inference from a witness's invocation of his fifth amendment privilege, recognized that a section 853(n) proceeding is *civil* in nature.

## IV. THE MEANING OF THE TERM "BONA FIDE PURCHASER FOR VALUE"

### A. *WMOT's Contentions*

■ The thrust of WMOT's appeal is that the district court, in holding that a victim of embezzlement lacks standing under section 853(n)(6)(B), adopted an unduly narrow construction of the term "bona fide purchaser for value." WMOT urges us instead to construe the term more liberally so as to protect the legitimate interests of all innocent third parties. To bolster its interpretation of section 853(n)(6)(B), WMOT directs us to subsection (*o*), which states that "[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes." Among the remedial purposes of section 853, WMOT contends, is the protection of the property rights of innocent third parties, *see* S.Rep. No. 225, 98th Cong. 1st Sess. 208, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3391 [hereinafter S.Rep. No. 225]. WMOT also relies on the hoary maxim that "the law abhors a forfeiture." *See United States v. One 1936 Model Ford V–8 De Luxe Coach,* 307 U.S. 219, 226, 59 S.Ct. 861, 864–65, 83 L.Ed. 1249 (1939) ("Forfeitures are not favored; they should be enforced only when within both letter and spirit of the law."). By foreclosing its sole avenue of judicial relief, WMOT asserts, the district court

THE GOVERNMENT: [B]ecause *the nature of this proceeding is civil,* I would say that the United States is entitled to have an inference, a negative inference drawn from a Fifth Amendment assertion by the witness. That's the record that I would seek to make.

THE COURT: You say you think you're entitled to that inference because this is a civil proceeding?

THE GOVERNMENT: Well, Your Honor, it's a proceeding—I hesitate to call it a civil proceeding, but I say *it's a civil proceeding in nature.* The burden of proof—the preponderance, it does flow from a criminal statute; *nevertheless, it is civil in nature.* And because of the nature of the proceeding, I think I'm entitled to make the record—at least argue to the Court that a negative inference should be drawn from it.

(Emphases added).

contravened the salutary purpose of section 853(n).

WMOT further maintains that its more expansive reading of the term "bona fide purchaser for value" has been endorsed by two courts. *See United States v. Reckmeyer*, 836 F.2d 200 (4th Cir.1987); *United States v. Mageean*, 649 F.Supp. 820 (D.Nev.1986), *aff'd*, 822 F.2d 62 (9th Cir. 1987); *but see United States v. Campos*, 859 F.2d 1233 (6th Cir.1988) (holding that general, unsecured creditors are not "bona fide purchasers for value"). In *Reckmeyer*, the criminal defendant's father, who had loaned the defendant money to purchase a parcel of real estate, and a gem merchant, who had sold two precious stones to the defendant on credit, petitioned the court under section 853(n) to amend the forfeiture order. 836 F.2d at 202. Both petitioners sought to recover out of the defendant's assets, virtually all of which had been ordered forfeited, the amount of their unsecured claims. The Fourth Circuit, after rejecting the government's claim that unsecured creditors lack a "legal interest" under the statute, construed the term "bona fide purchaser for value" liberally "to include all persons who give value to the defendant in an arms'-length transaction with the expectation that they would receive equivalent value in return." *Id.* at 208. The *Reckmeyer* court then held that both petitioners were bona fide purchasers in that they gave value to the defendant in anticipation of receiving value in return. *Id.* at 208–09.

Likewise, the *Mageean* court declined to adopt the government's interpretation of section 853(n)(6)(B). The court instead held that unsecured trade creditors, who had provided goods and services to the defendant and who sought to satisfy their claims out of the defendant's forfeited assets, qualified as bona fide purchasers for value under the statute:

> Although a bona fide purchaser is traditionally thought of as a buyer of tangible property, given the purposes of the statute, there is no reason that a good faith provider of goods and services cannot be a bona fide purchaser under the statute. The trade creditors before the Court are innocent parties and their transactions with [the forfeitor] were made at arm's-length.

649 F.Supp. at 829.

WMOT argues that its claim against Lavin's forfeited assets falls squarely within the *Reckmeyer* and *Mageean* courts' construction of the term "bona fide purchaser for value":

> WMOT is a creditor of Lavin which has a legal interest in the forfeited estate and which gave (albeit unwittingly) value to the forfeited estate. The value given was the approximately $440,000 that Stewart embezzled from WMOT for Lavin's benefit. In other words, due to Lavin's receipt of benefits from the embezzlement from WMOT, "a bona fide obligation arose between" WMOT and Lavin, and WMOT thereby "purchased 'property' i.e., [its] claims against [Lavin's estate]."

Appellant's Br. at 12–13 (citation omitted). Indeed, WMOT contends that its petition presents an even more compelling case for relief than that of the third parties in *Reckmeyer* and *Mageean*. WMOT points out that, unlike the petitioners in the above two cases, it has obtained a judgment (admittedly, a default judgment) against the forfeitor. WMOT also submits that, because it was an innocent victim of unlawful conduct perpetrated by the forfeitor, its plight is significantly more sympathetic than that of either a maker of an unsecured intrafamily loan or a provider of goods and services.[8]

This latter point, WMOT insists, underscores the tension between the district court's advertent/inadvertent distinction and the putatively broad remedial purpose of section 853(n). According to WMOT, a third party whose interest in the forfeited estate arises from an inadvertent, tort-like obligation suffers the same harm—and thus merits the same relief—as a third party whose interest arises from an advertent, contract-like obligation. Given that the purpose of section 853(n) is, in WMOT's

---

**8.** We will analyze both *Reckmeyer* and *Mageean* *infra* at Part IV.B.3.

view, to protect the property rights of all innocent third parties while preserving the deterrent and punitive effects of forfeiture, WMOT asserts that contract and tort obligations should be treated alike under subsection (B).

WMOT also emphasizes that, due to the nature of embezzlement, we need not hold that *all* tort-like obligations amount to bona fide purchases under the statute. As WMOT explains, obligations that arise from embezzlement are different from those that arise from the typical tort situation such as an automobile accident, because the embezzler, by injuring his or her victim, is enriched. In other words, WMOT (the tort victim) actually *conveyed* value to Lavin (the putative tortfeasor) in an amount that is easily quantifiable in dollar terms. By conveying value to Lavin, WMOT contends that it "purchased" a claim against his forfeited estate that is cognizable under section 853(n)(6)(B), especially in light of our duty to construe that subsection liberally.

### B. *Discussion*

We recognize that the bona fide purchaser language of section 853(n)(6)(B) is less than pellucid, and that, as such, we must engage in a certain amount of interstitial lawmaking. We also acknowledge that, in light of section 853(*o*) and the well-settled dictates of forfeiture law, we are obliged to construe the term "bona fide purchaser for value" liberally. Having examined the statutory language, the legislative history, and the cases on which WMOT relies, however, we nonetheless embrace the district court's advertent/inadvertent distinction as a proper gloss on the statute.

### 1. The Statutory Language

As always, the most authoritative indicators of what Congress intended are the words that it chose in drafting the statute. *See* 2A N. Singer, *Sutherland Statutory Construction* § 46.03, at 82 (4th ed. 1984) ("What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will."). Here, we think that Congress's use of the word "pur-

chaser" by itself connotes an intent to include only volitional transactions. As the *Mageean* court observed, "it does not seem possible to stretch the definition of bona fide purchaser to include ... tort claimants." 649 F.Supp. at 824.

More significantly, we believe that WMOT's claim cannot be squared with the requirement of section 853(n)(6)(B) that the petitioner be reasonably without cause to believe at the time of the purchase that the property was subject to forfeiture. This requirement, we submit, would make little sense if section 853(n)(6)(B) also applied to transactions into which the petitioner entered inadvertently. If the petitioner conveyed value to the criminal defendant involuntarily, it would be foolish, we think, for the courts to inquire whether, at the time of the transfer, the petitioner had any knowledge that the defendant's assets were subject to forfeiture. In this case, even if WMOT knew that Lavin was engaged in drug trafficking, and that his assets thus were subject to forfeiture, that knowledge would be immaterial, because WMOT was unaware that it was transferring any value (through Stewart) to Lavin.

WMOT recognizes this tension, but asserts that the petitioner's knowledge need not be a vital component of every petition. We must, however, refrain, if possible, from interpreting Congress's language in a manner that renders a component of the statute superfluous. WMOT also points out that, from the perspective of Lavin (the embezzler/forfeitor), the transaction certainly was advertent. This is true, but irrelevant. As the preceding discussion makes plain, section 853(n)(6)(B) makes sense only if the transaction was advertent from the point of view of the petitioner, WMOT. In sum, we think that Congress's concern with the petitioner's knowledge at the time of the purchase indicates that it intended this section to encompass only advertent business transactions.

### 2. The Legislative History

Nothing in the legislative history of section 853(n) persuades us to construe the term "bona fide purchaser for value" any

differently. As we read the relevant history,[9] Congress did not intend section 853(n) to serve as a vehicle by which *all* innocent third parties who are aggrieved by an order of criminal forfeiture can petition for judicial relief. Rather, it seems to us that Congress, in enacting section 853(n)(6)(A) and (B), intended to accord standing to only two narrow classes of third parties, and intended to require all other third parties to petition the Attorney General for relief, *see* 21 U.S.C. § 853(i).

Before passage of the Comprehensive Forfeiture Act of 1984, *"all* third parties, whether asserting a legal or equitable basis for relief from an order of criminal forfeiture, [were required to] pursue the remedy of petitioning the Attorney General for remission or mitigation of forfeiture." S.Rep. No. 225, *supra,* at 3390 (emphasis added). The resolution of such petitions was left entirely to the discretion of the Attorney General and was not subject to judicial review. *Id.* Because the Department of Justice and Congress were troubled by this practice, they agreed to carve out a limited exception:

> [I]f a third party can demonstrate that his interest in the forfeited property is exclusive of or superior to the interest of the defendant, the third party's claim renders that portion of the order of forfeiture reaching his interest invalid. The [Senate Judiciary] Committee strongly agrees with the Department of Justice that such third parties are entitled to judicial resolution of their claims.

*Id.* at 3391. Congress thus afforded two narrow categories of third parties standing to petition the courts to determine the validity of their claims to forfeited assets. Standing to petition exists

> first, where the petitioner had a legal interest in the property that, at the time

of the commission of the acts giving rise to the forfeiture, was vested in him rather than the defendant or was superior to the interest of the defendant; or second, where the petitioner acquired his legal interest after the acts giving rise to the forfeiture but did so in the context of a *bona fide* purchase for value and had no reason to believe that the property was subject to forfeiture.

*Id.* at 3392 (emphasis in original). For the majority of third parties, however, who assert an equitable, rather than a legal, entitlement to relief,[10] petitioning the Attorney General for remission and mitigation remains the exclusive remedy. *Id.* at 3391.

To understand who Congress intended to protect in fashioning these two narrow exceptions, it is helpful to ascertain the source of Congress's language. As far as we can tell, Congress derived both exceptions essentially from hornbook commercial law. The first exception, codified in section 853(n)(6)(A), reflects the common-law principle, embodied in the venerable maxim *nemo dat qui non habet,*[11] that a buyer acquires no better title than that of the seller. *See* UCC § 2–403(1) ("A purchaser of goods acquires all title which his transferor had or had power to transfer....."). Under the relation-back doctrine, the government acquires its interest in the defendant's forfeited property at the time of the commission of the criminal acts giving rise to the forfeiture. *See* 21 U.S.C. § 853(c). Thus, if a third party's interest in the forfeited property, at the time of the criminal acts, was superior to the criminal defendant's interest, then the interest that the government acquires when it steps into the defendant's shoes is subordinate to that of the third party. As we explained *supra* note 1, WMOT concedes that it cannot take advantage of this exception because, at the

---

9. The legislative history discussed below actually involves 18 U.S.C. § 1963(*l*), a provision of the RICO statute that is identical to section 853(n). Because these two provisions are identical, and section 853(n) adopted the language of section 1963(*l*) without adding any history of its own, we think that the history of section 1963(*l*) also serves as a guide to Congress's intent regarding section 853(n).

10. In distinguishing between "legal" and "equitable" bases for relief, Congress obviously intended the word "equitable" to be accorded its more general meaning ("fair and just") as opposed to its technical meaning as understood by lawyers ("existing in equity").

11. "He who hath not cannot give." Black's Law Dictionary 1037 (6th ed.1990).

time of the commission of the criminal acts (beginning in 1978), it had not yet acquired any interest in Lavin's property (Stewart did not embezzle money from WMOT and transfer funds to Lavin until 1981).

The second exception, codified in section 853(n)(6)(B), reflects another common-law rule (an exception to the *nemo dat qui non habet* principle), namely, that an "innocent purchaser for valuable consideration must be protected." *Mowrey v. Walsh*, 8 Cowen 238, —— (N.Y.1828); *see* UCC § 2–403(1) ("A person with voidable title has power to transfer a good title to a good faith purchaser for value."). The good-faith purchaser exception developed over time in order to promote finality in commercial transactions and thus to encourage purchases and to foster commerce. It does so by protecting the title of a purchaser who acquires property for valuable consideration and who, at the time of the purchase, is without notice that the seller lacks valid and transferable title in the property. In *Johnson & Johnson Products, Inc. v. Dal International Trading Co.*, 798 F.2d 100, 104 (3d Cir.1986), we described the purpose of this exception as follows:

> The purpose of the good faith purchaser doctrine, codified in Sections 2–403 and 2–102 of the UCC, is to promote commerce by reducing transaction costs; it allows people safely to engage in the purchase and sale of goods without conducting a costly investigation of the conduct and rights of all previous possessors in the chain of distribution.

The operation of UCC § 2–403(1) is illustrated by the following hypothetical: X has voidable title in a painting, because he fraudulently acquired it from Y. A third party, W, then purchases the painting from X for value without any notice of Y's competing interest in the painting. Under these circumstances, UCC § 2–403(1) would accord to W, a good-faith purchaser for value, good title in the fraudulently acquired painting.

The good-faith purchaser exception translates easily into the forfeiture context. After the commission of the criminal acts, title to the forfeitable property, by operation of the relation-back clause, actually belongs to the government. The property itself, however, generally remains in the criminal defendant's physical possession until the government discovers the criminal acts and takes possession of the forfeitable property. While the forfeitable property is in the defendant's possession, the defendant possesses only voidable title, but ordinarily, a prospective purchaser of the forfeitable property will have no notice that the defendant lacks a valid, transferable interest. Section 853(n)(6)(B) ensures that, if indeed the defendant transfers the forfeitable property for value to a purchaser who, at the time of the purchase, is without knowledge of the government's interest in the property, the government may not later assert title superior to that of the innocent purchaser. Extension of the good-faith purchaser exception to the forfeiture context thus facilitates commerce, as it does in the general commercial law context, by removing an impediment to commercial transactions—to wit, the need for a purchaser to engage in exhaustive research, in order to discover whether there are competing claims to the property, prior to consummating a sale.

In arguing that a victim of embezzlement is a bona fide purchaser for value under section 853(n)(6)(B), however, WMOT seeks to extend that exception well beyond its commercial law origins. This point is demonstrated by the following variation on the above hypothetical: Assume that X not only acquired a painting from Y through fraud, but also subsequently embezzled a large sum of money from his employer, Z. Sometime later, both the fraud and the embezzlement are discovered, and Y and Z sue to recover X's only remaining asset, the painting. Section 2–403(1) of the UCC would not allow Z to seize the painting in satisfaction of his embezzlement judgment, even though Z conveyed value (albeit inadvertently) to X. Rather, the painting would be returned to Y, its rightful owner.

Returning to the facts and parties at bar, we believe that the government most resembles "Y," Lavin "X," and WMOT "Z." Like Y in our second hypothetical, the government acquired title to all of Lavin's

assets before WMOT, or Z, acquired any interest in the forfeited property. Lavin, however, like X, retained voidable title in the forfeitable property, because the government (its true owner) had not yet taken possession of it. Had WMOT, like W in our first hypothetical, *purchased* some of Lavin's forfeitable property in good faith without knowledge of the government's interest in that property, it would have been entitled to keep it. But that is not what happened here; instead, WMOT, like Z, was a victim of Lavin's embezzlement. Because that "transaction" (for want of a better word) does not qualify as a good-faith purchase for value under commercial law, WMOT's "legal" interest in Lavin's forfeited property, like Z's, remains inferior to that of the government, who, like Y, acquired its "legal" interest in the forfeited property sometime beforehand.[12]

We are reluctant to expand the reach of section 853(n)(6)(B) beyond that of its commercial-law analog, UCC § 2–403(1). We believe that allowing WMOT to avail itself of section 853(n)(6)(B) would not further in any way the historical purpose underlying the good-faith purchaser exception. Because WMOT acquired its interest in Lavin's property unwittingly, as a victim of embezzlement, its ability to protect its interest in the forfeited property *vis a vis* the government will have no effect whatsoever on commerce. Simply stated, commerce will not be promoted by facilitating the type of transactions by which WMOT acquired its interest in Lavin's property. Indeed, we can perceive of no economic justification, from the perspective of traditional commercial law, for protecting WMOT's "legal" interest rather than that of the government—which, as we noted earlier, acquired its "legal" interest in Lavin's property a full three years before WMOT.

Because, under commercial law, WMOT's "legal" interest in Lavin's property is subordinate to the government's, WMOT must rely on an "equitable" argument that, in view of its sympathetic status as a victim of embezzlement, it nonetheless should be entitled to recoup some of its losses from Lavin's forfeited property. But that argument must be addressed to the Attorney General, not the courts.

In sum, we see no reason to stretch Congress's language so as to fit WMOT into the narrow confines of the bona fide purchaser exception. The legislative history of section 853(n), contrary to WMOT's contentions, does not evince a broad-based intent to protect the interests of all innocent third parties. Congress instead defined two rather limited categories of third parties who are entitled to petition the courts for a hearing to adjudicate the validity of their interests in the forfeited property. Those third parties who fall outside of both exceptions, regardless of how sympathetic they are, must petition the Attorney General for relief. S.Rep. No. 225, *supra*, at 3392 ("A third party who fails to obtain relief under the new ancillary hearing provision ... may seek equitable relief from the Attorney General by filing a petition for remission or mitigation of forfeiture."). WMOT forthrightly concedes that it does not meet the requirements of the first exception, and, having examined the origin and purpose of Congress's second exception, we think that according WMOT bona fide purchaser status would be contrary to commercial law principles as incorporated into the forfeiture regime and would make little practical or economic sense.

### 3. The Caselaw

We also think that WMOT's reliance on *Reckmeyer* and *Mageean* is misplaced. To

---

**12.** To round out the picture, we reiterate that WMOT is forced to attempt to fit itself into the bona fide purchaser exception of section 853(n)(6)(B) for two reasons. First, as we have explained above, WMOT is unable to take advantage of section 853(n)(6)(A)'s exception, because its interest in Lavin's estate arose a full three years after the government's interest had vested. *See supra* note 1. Second, WMOT is also unable to recover from Lavin, because it cannot identify in Lavin's estate the specific funds that were embezzled from it, and thus can assert no more than a general claim against Lavin's estate. Had Lavin deposited WMOT's funds in a separate account or in some other way made possible their specific identification or tracing, those funds—which derive from embezzlement, not drug trafficking—would not have been subject to forfeiture, and hence the government would have had *no* interest in them.

begin with, the *Mageean* court expressly held that tort claimants are not "bona fide purchasers for value" under the statute. The petitioners in *Mageean*, aside from the unsecured trade creditors discussed *supra* at 183, were tort claimants who had been injured when an airplane, in which the forfeitor owned an interest, crashed. 649 F.Supp. at 820–21. Because the aircrash occurred after the criminal acts giving rise to the forfeiture, the only category into which the tort claimants possibly could fit was the bona fide purchaser exception. *Id.* at 823. The court, in holding that these tort claimants were not bona fide purchasers for value, explicitly rejected the claimants' argument, like the one advanced by WMOT here, that no statutory purpose would be served by denying them relief:

> While it is true that their claims were not created through "sham" transactions, it does not seem possible to stretch the definition of bona fide purchaser to include the tort claimants. This is especially true since Congress could have easily provided for judicial determination of tort claimants but chose instead to protect only two classes of claimants.... Therefore, their sole remedy is to petition the Attorney General.

*Id.* at 824.

WMOT rejoins, however, that its situation differs from that of the *Mageean* tort claimants because it actually conveyed value to the forfeitor, Lavin. In view of our prior discussion, we think that WMOT identifies a distinction without a difference. To be a "bona fide purchaser," the claimant must establish more than a mere conveyance of value; it must show that it intentionally transferred value to the forfeitor with an expectation of receiving value in return.

Furthermore, although neither *Mageean* nor *Reckmeyer* makes the point in terms, both courts defined the term "bona fide purchaser" to encompass only advertent transactions. We intimate no view concerning the propriety of these courts' construction of section 853(n)(6)(B), and we observe that both decisions are at odds with the Sixth Circuit's decision in *United States v. Campos*, 859 F.2d 1233 (6th Cir. 1988).[13] We simply point out that neither *Reckmeyer* nor *Mageean* bolsters WMOT's proposed construction of section 853(n)(6)(B). The *Reckmeyer* court concluded that

> in order to effectuate legislative intent the term "bona fide purchaser for value" must be construed liberally to include all persons who give value to the defendant in an arms'-length transaction with the expectation that they would receive equivalent value in return.

836 F.2d at 208. Similarly, the *Mageean* court, in distinguishing trade creditors (who it found to be bona fide purchasers) from tort claimants, stated:

> Although the trade creditor's losses may be insignificant in comparison to the tort claimants' injuries, the tort claimants were not involved in an arms'-length transaction with [the forfeitor] and did not pay value for their claims.

649 F.Supp. at 826. Both courts, in roughly defining "bona fide purchase" as an arm's length transaction, evince an understanding that the term bona fide purchase for value extends only to transactions into which the petitioner entered knowingly. Although the terms "arm's length" and "advertent" are, of course, by no means synonymous or interchangeable,[14] arm's

---

**13.** The *Campos* court's construction of the term "bona fide purchaser" under subsection (B) is even less hospitable to WMOT. Unlike the *Reckmeyer* and *Mageean* courts, the Sixth Circuit, though recognizing that it was obligated to construe the term liberally, held that general, unsecured creditors are not "bona fide purchasers for value" under the statute:

> We conclude that unsecured creditors ... should not be allowed to assert claims under § 853(n)(6)(B). Such unsecured creditors do not fit the traditional definition of "bona fide

purchasers." As this is a legal term of art, we are unwilling to give the phrase an unnatural meaning only for the purpose of subsection (n)(6)(B). We recognize that this interpretation of the forfeiture statute mandates a harsh result, but it is a result frequently mandated by forfeiture procedures.

859 F.2d at 1238 (footnote omitted).

**14.** Black's Law Dictionary defines "arm's length transaction" as follows: "Said of a transaction negotiated by unrelated parties, each acting in

length transactions are by definition advertent.

From WMOT's perspective, *Reckmeyer* and *Mageean* at best stand for the proposition that the term "bona fide purchaser for value" should be construed liberally. Beyond that, those cases offer little authority for WMOT's contentions. Both courts defined bona fide purchaser in a manner that would exclude transactions into which the petitioner entered unwittingly, and both remarked that even that definition was somewhat inconsistent with the traditional meaning of the term. If we were to endorse WMOT's argument that the bona fide purchaser exception encompasses victims of embezzlement, we would have to strain the language of section 853(n)(6)(B) even further. Given Congress's concern with the petitioner's knowledge at the time of the "purchase," and the historic purpose of the good-faith purchaser exception at commercial law, we think that section 853(n)(6)(B) is insufficiently elastic to support WMOT's procrustean interpretation. We therefore reject WMOT's contention that a mere conveyance of value is sufficient to establish a bona fide purchase, and conclude that the district court correctly held that section 853(n)(6)(B) applies only to advertent transactions.

## V. CONCLUSION

For the foregoing reasons, the order of the district court dismissing WMOT's petition under 21 U.S.C. § 853(n)(6)(B) to amend the order of forfeiture will be affirmed.

his or her own self-interest...." Black's Law Dictionary 109 (6th ed.1990). On the other hand, the adjective "advertent" (contrasted with "inadvertent") generally means "intentional."