589 So.2d 255 (1991)
FLORIDA NATIONAL BANK OF MIAMI, etc., et al., Petitioners,
v.
BANKATLANTIC, etc., Respondent.
No. 75965.
Supreme Court of Florida.
October 24, 1991.
Rehearing Denied December 9, 1991.
David D. Welch of Welch & Korthals, Pompano Beach, for petitioners.
Eugene E. Stearns, Lisa K. Bennett and Richard E. Douglas of Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, P.A., Miami, for respondent.
OVERTON, Justice.
We have for review Florida National Bank v. Bankatlantic, 557 So.2d 596 (Fla. 4th DCA 1990), in which the district court *256 held that the mortgagee's exercise of an option to accelerate payments owing under a mortgage note following the mortgagor's intentional default did not preclude the mortgagee from collecting a prepayment penalty fee. Because this is a case of first impression that establishes an exception to an accepted legal principle, the district court certified the following question as one of great public importance:
WHETHER IN COMMERCIAL VENTURES, WHERE THE NOTE CONTAINS BOTH A PROVISION FOR ACCELERATION AND A PROVISION FOR PREPAYMENT PENALTY FEES, AND THE MORTGAGEE HAS ELECTED TO ACCELERATE THE MORTGAGE BECAUSE OF AN INTENTIONAL DEFAULT BY THE MORTGAGOR, WHO SUBSEQUENT TO NOTIFICATION OF FORECLOSURE PROCEEDINGS BUT PRIOR TO A FORECLOSURE SALE, HAS CONSUMMATED A PRIVATE SALE OF THE PROPERTY, IS IT WITHIN THE COURT'S DISCRETIONARY POWER TO CONSIDER THE EQUITIES AND ALLOW BOTH PROVISIONS TO BE EFFECTUATED SIMULTANEOUSLY DUE TO THE PREMATURE TERMINATION OF THE MORTGAGE?
Id. at 599. We have jurisdiction,[1] answer the question in the affirmative, and approve the district court's decision.
Florida National Bank of Miami is nominally involved in this litigation as trustee of a land trust and as mortgagor of the subject property. Edwin F. Gordon is the sole beneficiary and real party in interest. For the purposes of clarity, the petitioner-mortgagor will be referred to as Gordon and the respondent-mortgagee as Bankatlantic.
Gordon built an apartment project as a tax shelter and, after completion of construction in 1976, executed a note and mortgage turning the construction loan into a permanent twenty-five-year loan due June 1, 2001. The note and mortgage contained both a prepayment clause and a default acceleration clause. The prepayment clause read as follows:
In addition to the regular monthly installments herein provided for, the makers may, without penalty of any kind, make prepayments of the principal aggregating, in any loan year, 20% or less of the principal amount of this note. The makers may also prepay greater principal amounts than said 20% in any loan year, upon payment of 12 months interest on the amount by which such prepayments shall cause, in such loan year, an excess above the maximum free prepayments herein established.
The acceleration clause read as follows:
All makers and endorsers who now or hereafter become parties hereto jointly and severally waive demand, notice of nonpayment and protest, and agree that in the event of default on the payment of any installment due hereunder the whole of said indebtedness shall thereupon at the option of the holder, become immediately due and payable.
As noted, this apartment complex was built as a tax shelter device to shelter substantial income Gordon received from his business. In 1980, Gordon began experiencing financial difficulties with his business, and, in 1982, he made a business decision to sell the apartment complex for condominium conversion. To carry out this plan, Gordon stopped leasing the apartments as rentals and renewing existing leases. From 1982 on, Gordon pursued and negotiated with several prospective buyers for the property.
In April, 1984, Gordon's check for the monthly mortgage payment bounced and, as a result, the mortgage went into default on May 1, 1984. On May 11, 1984, Gordon inquired as to the possibility of the bank's waiving the prepayment penalty fee if he brought a prospective buyer to the bank and assured the bank that it would receive the end loans. Bankatlantic declined to waive the prepayment penalty and Gordon made no further monthly payments.
*257 On June 6 and 20, 1984, Bankatlantic sent default letters to Gordon. On September 7, 1984, Gordon entered into a purchase and sale agreement to sell the apartment complex. Four days later, on September 11, 1984, Bankatlantic filed a foreclosure action against Gordon, including the customary notice of its election to accelerate the maturity date under the loan agreement. Nothing in this record indicates that the bank knew of the purchase agreement at the time it initiated the foreclosure proceeding.
On December 18, 1984, while the foreclosure proceeding was pending, Gordon sold the mortgaged property and tendered payment of the entire principal balance, default rate interest, attorney's fees, and costs to Bankatlantic. At that point, Gordon again requested that the bank waive the prepayment penalty. In order to allow the sale of the property to close and preserve the issue for a later judicial determination, Bankatlantic agreed to satisfy the mortgage in exchange for payment of all outstanding principal, default interest, advances, attorney's fees, and costs after obtaining Gordon's agreement to escrow an amount equal to the prepayment penalty and anticipated attorney's fees. The mortgage was then satisfied and the sale was closed.
The only issue before the trial court was whether a provision in the mortgage note imposing a penalty for prepayment was applicable after Bankatlantic elected to declare the note due and payable in full, pursuant to a separate optional default-acceleration clause. After a nonjury trial, the trial judge held that Gordon intentionally defaulted on the mortgage loan and that it would be inequitable for him to escape liability for the prepayment clause. In his extensive order, the trial judge made the following pertinent findings of fact:
4. From 1976 until May 1984 the loan remained current and for the most part payments were timely.
5. Gordon claims that he had financial difficulties in his other businesses and was therefore forced to default on the loan. He further contends that Atlantic Federal elected to accelerate the note and foreclose on the mortgage and therefore eliminated its right to collect prepayment penalties.
6. Atlantic Federal presented evidence which contradicted the claim by Gordon that his default was involuntary and solely a result of his other business problems and that the acceleration eliminated Atlantic Federal's rights.
7. Gordon testified at trial that as early as 1982 he intended to sell the apartment building and put a plan in place to find a purchaser with the hope of selling the building to a developer so it could be converted into a condominium. Gordon further testified that it was his intention in 1983 to pay off the note with Atlantic Federal prior to the year 2001 since he fully expected to find a buyer for his apartment building prior to that year.
8. Mr. Donald Streeter, President of Atlantic Federal in 1984, and Mr. Paul Rust, Vice President of the Commercial Mortgage Department of Atlantic Federal, testified that in early May 1984, Gordon approached them and requested that the prepayment penalty be waived by Atlantic Federal when he sold the building and that, in return, he would bring the purchasers to Atlantic Federal so that Atlantic Federal would receive the end loans. Mr. Streeter and Mr. Rust both testified that the prepayment penalty was never waived. They also testified that at that time, they believed it was Gordon's intent and desire to avoid paying the prepayment penalty.
9. Both the testimony of Mr. Streeter and of Mr. Rust was credible and Gordon presented no evidence to contradict their testimony of his intention and desire not to pay the prepayment penalty.
... .
11. Gordon testified at trial that in February 1984 he stopped leasing the apartments to new tenants and refused to renew leases with existing tenants as part of his business plan to sell the building; the end result of which was a significant depletion of his cash flow since *258 rental income was not generating sufficient sums to pay the mortgage.
12. In December 1984 Gordon's business plan was culminated by the closing of his apartment building for the sum of thirteen million five hundred thousand dollars... .
... .
17... . Gordon prepaid the loan from the proceeds of the sale of the property, an event he expected to occur and in fact worked towards as part of a business plan which he commenced in late 1983. The bank did not cause this early repayment. The note was not paid according to the agreed upon terms of the note. The foreclosure action was instituted so that Atlantic Federal could protect its interest in the property and had nothing whatsoever to do with Gordon's agreement to pay a penalty if he prepaid the loan. Gordon's own testimony was that he intended to prepay before there was a default and before the acceleration.
18. The Court finds that had the bank not foreclosed the mortgage as it had, the alternative would have been for Atlantic Federal to file an action every thirty (30) days on the interest payment due so as not to accelerate the note and thereby preserve the bank's bargained for right to a prepayment obligation. Such a result would be illogical, irrational and would certainly clog the Court's docket and would amount to an unnecessary expense of judicial resources.
In his conclusions of law, the trial judge determined that he had the discretion to require prepayment where there was an intentional default and explained his holding by stating:
3. Where a borrower deliberately defaults on a note and the lender is forced to accelerate the note in order to protect its rights and to avoid bringing a separate action each month to enforce the note the borrower cannot obtain greater rights than a borrower who timely pays his debts as they come due. If the loan is prepaid, in the first instance the borrower should not be exempted from paying the penalty while the second borrower is required to pay it. This is a logical conclusion which clearly finds support in the principles and policies applied by the Courts.
4. The cases cited by Gordon which limit the lender's right to receive a prepayment penalty do not apply here and are not binding on this Court. Generally, those cases are limited to their facts. In the Matter of LHD Realty Corp., 726 F.2d 327 (7th Cir.1984), the Court specifically limits its ruling to the facts of the case and indeed states that "Courts could deal with the difficulty of [intentional default] by denying the acceleration exception in appropriate cases." Atlantic Federal firmly established here that the borrower willfully defaulted on the loan after being unable to negotiate a waiver of the prepayment penalty with Atlantic Federal officers and as a result of his business plan to sell the apartment building being frustrated when the sale did not close in March 1984 as scheduled. Gordon's plan was ultimately realized and the building sold and the note paid in December 1984, an obvious prepayment of the loan.
In affirming, the district court of appeal stated:
Opinions differ as to whether the court, in an equitable proceeding, should consider the issue of intentional default. We endorse the general rule that unless otherwise specifically provided for in the note, the lender cannot upon the lender's acceleration also collect the prepayment penalty. Such a rule is based on the premise that it was the lender's voluntary choice of exercising the option to collect full payment now, rather than waiting, that accelerated the maturity date of the loan. However, it is axiomatic that a party to a contract should not profit from his own intentional default. We feel that courts should deal with the difficulty of intentional defaults by denying the acceleration exception and finding liability for the prepayment penalty in appropriate cases. In commercial settings, under scenarios such as the instant case, courts should be allotted the discretion *259 to consider the question of timeliness of default, the voluntary nature of the tender of full payment of the note and the involuntary nature of the lender's action to accelerate the note and make exceptions to the general rule. The trial court weighed these considerations and we affirm its finding of liability.
557 So.2d at 598 (citations omitted). We fully agree.
Gordon asserts that "prepayment" is payment before maturity and once a lender accelerates maturity, "prepayment" is, by definition, not possible. He argues that we should follow the decision of a recent case decided by the Supreme Court of Washington in Rodgers v. Rainier National Bank, 111 Wash.2d 232, 757 P.2d 976 (1988), in which it rejected the claim for prepayment where the default was deliberate and intentional to avoid the prepayment obligations. Gordon also asserts that the decision by the United States Court of Appeals for the Seventh Circuit in In re LHD Realty Corporation, 726 F.2d 327 (7th Cir.1984), supports his position.
We reject these arguments and agree fully with the trial and district courts that Gordon should not be able to profit from his own intentional default under the circumstances of this cause. We note, as did those courts, that LHD Realty acknowledged that there could be an exception to the general rule where there was a finding of an intentional default. Foreclosure actions are litigated in a court of equity, and chancellors of those courts traditionally have been granted the discretion and authority to do justice between the parties, particularly in circumstances where one party is attempting to profit from his own intentional misconduct. This was not a sale under duress but a sale planned in advance beginning within Gordon's decision in 1982 to convert the property from rental apartments to condominiums. That decision also included a decision later not to lease or renew leases on the apartments in the property. This latter decision made the property more salable but also substantially reduced the income from the property. Gordon's conduct and his conversations with the bank officers clearly justify the factual finding of the trial court that his conduct was intentional with the purpose of avoiding the prepayment penalty.
We find that the limited exception created by this decision to the general rule that a mortgagee cannot both accelerate and receive a prepayment penalty is clearly appropriate under the special circumstances in this case.
Accordingly, we answer the certified question in the affirmative and approve the decision of the district court of appeal.
It is so ordered.
McDONALD, BARKETT and KOGAN, JJ., concur.
GRIMES, J., dissents with an opinion, in which SHAW, C.J., concurs.
GRIMES, Justice, dissenting.
While I agree with the Court's resolution of the certified question in cases of intentional default, there is insufficient evidence in this record to support the court's conclusion that Gordon's default was intentional.
Gordon executed the mortgage note in 1976, at a time when he was the chairman of the board and president of a successful manufacturing business in Wisconsin. At the outset of its operation as the Landmark Apartments, the property was not intended to nor did it at any time generate sufficient rental income to fully cover the mortgage payments and operating expenses. The project was conceived and implemented as a tax-shelter device which would generate negative cash flow as a means of sheltering the high income Gordon was then receiving from his manufacturing business.
In 1980 and 1981 there was a labor strike in Gordon's business that led to the bankruptcy of his company. As a result of the bankruptcy and other investment losses, Gordon lost approximately ten million dollars in 1981 and 1982. Faced with worsening financial problems, Gordon realized by 1982 that he would no longer be in a position to use personal funds to supplement the rental income from the Landmark Apartments in order to meet the mortgage *260 payments and operating expenses. Thus, it was evident that he would ultimately lose the apartments unless he could sell them. By April of 1984, Gordon was insolvent and had numerous judgments entered against him. After the assets of the Wisconsin company were sold to the trustee in bankruptcy in May of 1984, Gordon owed over six million dollars to Harris Trust and Savings Bank under personal guaranties of the bankrupt company's loan. Gordon's precarious financial situation ultimately led to the default on the mortgage when his check for the April 1, 1984, mortgage payment to First Atlantic was returned for insufficient funds. Gordon thought he had a refinancing arrangement worked out with Harris Trust and Savings Bank, but Harris refused to honor the check.
In support of the finding of an intentional default, First Atlantic relies upon Gordon's intent to sell the apartments as a condominium complex and his request for a waiver of the prepayment penalty. However, the decision to sell Landmark as a condominium complex rather than as apartments was dictated by the market. In addition, notwithstanding the fact that Gordon ultimately stopped seeking to lease the apartments in order to carry out his plan to sell, the rental income from the apartments remained steady in 1982 and 1983. The rental income only began to drop after Gordon actually signed a contract to sell the apartments to Frank Imprescia on February 25, 1984. Furthermore, the rental income was never at any time sufficient to pay the mortgage payments and operating expenses, and by the time of the sale Gordon had no money of his own to contribute to keep the apartments afloat.
The finding by the trial judge that Gordon did not default on the loan until after the bank officials refused to waive the prepayment penalty reflects a basic misunderstanding of the evidence. Gordon defaulted on the payment due on April 1, 1984. It was not until May 11, 1984, that Gordon first asked the bank if it would forego prepayment penalties if the pending sale to Imprescia were consummated. According to the allegations of the bank's complaint, the bank did not refuse to waive the prepayment penalty until May 29, 1984. The fact that Gordon discussed with bank officials the possibility of waiving the prepayment penalty in the event the Imprescia sale went through did not mean that he intentionally failed to pay the mortgage that was already in default. As it turned out, the Imprescia sale was not consummated, but Gordon was finally able to sell the apartments to another party. In the meantime, he continued to miss the mortgage payments because he was broke. The bank officials' testimony that in retrospect they believed that Gordon intentionally defaulted in order to avoid the prepayment penalty was irrelevant, if not inadmissible.
I agree that an intentional default on the payment of a loan constitutes an exception to the general rule that a lender cannot collect a prepayment penalty upon acceleration. However, if evidence such as this is sufficient to prove an intentional default, the exception will swallow the rule.
I respectfully dissent.
SHAW, C.J., concurs.
NOTES
[1] Art. V, § 3(b)(4), Fla. Const.